Michael Markovits, et al. [1] v. Commissioner. Markovits v. Commissioner
Docket Nos. 28885, 28886, 29112, 29113, 29737, 29738, 30191, 30195, 30563, 30564.
United States Tax Court
1952 Tax Ct. Memo LEXIS 126; 11 T.C.M. (CCH) 823; T.C.M. (RIA) 52245; July 31, 1952
Clyde C. Sherwood, Esq., 703 Market St., San Francisco, Calif., for the petitioners. R. G. Harless, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent has determined deficiencies in income tax and negligence penalties as follows: Docket
5% Penalty
Petitioner
No.
Year
Deficiency
Sec. 293 (a)
Michael Markovits
30564
1944
$ 6,957.38
$ 347.87
1945
42,741.49
2,137.08
28885
1946
7,905.43
Doris Markovits
30563
1944
7,083.14
354.16
1945
43,133.39
2,156.67
28886
1946
8,185.69
Edward Friedland
30195
1944
7,222.55
361.13
1945
42,605.61
2,130.28
29112
1946
14,905.60
Helen Friedland
30191
1944
7,222.55
361.13
1945
42,605.61
2,130.28
29113
1946
15,322.01
Clark Pickens
29738
1945
64,912.69
3,245.63
1946
21,438.51
1,071.93
Hazel Pickens
29737
1945
64,912.68
1946
21,438.51
Totals
$ 418,592.84
$ 14,296.16
*128 The respondent has waived 50 per cent fraud penalties in the respective amounts of $32,456.35 and $10,719.26, which he originally determined as increases in the deficiencies, for the years 1945 and 1946 in the proceeding of Clark Pickens, Docket No. 29738; but he has made claim for the 5 per cent negligence penalty under section 293 (a) in his amended pleading as additions to the deficiencies for 1945 and 1946. The respondent has entered into stipulations with the petitioners Edward and Helen Friedland which dispose of certain issues raised in the pleadings and determinations made by the respondent for the years 1945 and 1946 in Dockets 30191, 30195, 29112, and 29113. Effect will be given to the stipulations under Rule 50. The respondent has entered into a stipulation relating to the taxable year 1946, under which the parties have agreed to the amount of the long-term capital gain which was realized from the sale in 1945, during the fiscal year ended March 31, 1946, of the Denver Club, a business which was operated as a partnership by some of the petitioners. Effect will be given to this stipulation under Rule 50. The respective petitioners do not contest some of the adjustments *129 made by the respondents. Some of the petitioners have abandoned some of the issues which were raised in the respective pleadings. Amendments to all of the petitions have been filed by the respective petitioners. The petitioners, respectively, now contend that the gross sales of the Friedland-Markovits partnership for the fiscal year ended September 14, 1945, were overstated in the income tax return by $11,070; that certain adjustments should be made in recomputing net income for the fiscal year ended March 31, 1946, of the partnership which carried on business under the name of the Denver Club which will result in the increase of net income, the allowance of a deduction for depreciation, and the increase of a long-term capital gain from the sale of the assets of the Denver Club; and that the claimed deductions from 1946 income of Edward and Helen Friedland for losses and expenses aggregate, respectively, $15,021.24 and $6,716.99. The petitioners, husbands and wives, filed separate returns on the community property basis for the taxable years. All of the returns for the taxable years were filed with the collector for the first district of California. These consolidated proceedings *130 involving ten separate petitions present several issues. Certain issues are common to the proceedings of Michael Markovits (Dockets 30564, 28885); Edward Friedland (Dockets 30195, 29112); and Hazel Pickens (Docket 29737). The particular questions presented for decision will be set forth hereinafter, but in general they relate to the earnings of three partnerships, and of one sole proprietorship business conducted by Michael Markovits. The names under which business was conducted by each of the partnerships and the names of the partners, the name of the sole proprietorship, and the taxable years of the ventures involved in these proceedings are as follows: 1. Friedland-Markovits partnership. The partners were Edward Friedland (Docket 30195) and Michael Markovits (Docket 30564); the years involved are 1944, 1945. The wives of these petitioners, Doris Markovits (Docket 30563), and Helen Friedland (Docket 30191), are involved only because they and their husbands filed separate returns for 1944 and 1945 on the community property basis. 2. Pickens Liquor Stores partnership. The partners were Hazel Pickens (Docket 29737), Edward Friedland (Docket 30195); and Michael Markovits (Docket *131 30564); the year involved is 1945. Helen Friedland and Doris Markovits are involved because they reported income on the community property basis. 3. Mac's Place, a sole proprietorship, was operated during 1945 by Michael Markovits (Docket 30564). 4. The Denver Club, a partnership. The partners were Hazel Pickens (Docket 29737), Edward Friedland (Dockets 30195, 29112), and Michael Markovits (Dockets 30564, 28885); and years are 1945 and 1946. Helen Friedland and Doris Markovits are involved because they reported income from the partnership on the community property basis. The respondent, exercising his discretion under section 41 of the Internal Revenue Code, has reconstructed the gross income of each of the three partnership enterprises and of the sole proprietorship business above named. He has determined that all realized larger amounts of gross receipts from sales during the taxable years, and, therefore, larger net income, than were reported for each of the taxable years involved for each venture, and that, accordingly, the partners and the sole proprietor, in the instance of the sole proprietorship, realized larger amounts of income than were reported *132 in the individual returns of the petitioners. The respondent based his determinations upon the application of certain percentage mark-ups above the costs of merchandise, a gross margin method, and upon a determination that different percentages of sales were bar sales and were retail sales than were reported. No issue is presented about the costs or amounts of merchandise purchased in each business, the respondent having accepted the costs of merchandise which were reported in the income tax returns for the several business enterprises. He accepted, also, with a few minor exceptions, the business expenses claimed in the returns. The petitioners contend that the respondent's determinations based upon his reconstruction of the gross receipts of the several business ventures from bar sales and retail sales by the percentage allocations and percentage mark-ups adopted by the respondent and the resulting tax deficiencies should be set aside as arbitrary and excessive. The crux of the dispute between the petitioners and the respondent under the issue which relates to each liquor business venture is whether the amounts of gross sales from bar sales and from retail sales respectively as *133 shown by petitioners' records should be accepted as correct, or whether the respondent's mark-ups and allocations of sales between the two classes of sales should be approved. Another issue relates to the Denver Club business for its fiscal year ended March 31, 1946. The question is whether the Denver Club is entitled to deduct the sum of $8,576.20 which was paid to O.P.A. for overcharges in sales of bottled beer in violation of O.P.A. regulations. Other issues relate to only Hazel and Clark J. Pickens (Dockets 29737-8), and Edward Friedland (Docket 29112), and are as follows: Dockets 29737-8: Whether expenditures made in 1945 in the total amount of $3,448.13 by Hazel and Clark J. Pickens for the renovation of income-producing property which they purchased in 1945 are capital expenses or ordinary expenses. The petitioners claim deduction of the entire amount as ordinary expense, and contend that no part thereof constituted capital expenses. Docket 29112: Whether various expenses, aggregating $6,716.99, were paid by Edward Friedland and are deductible in 1946 as ordinary and necessary expenses. There are about seven types of expenses involved under this general issue which relate *134 to several alleged business transactions. Docket 29112: Whether the petitioner, Edward Friedland, sustained losses in 1946 in the total amount of $15,021.24. There are about ten items of alleged losses. The final issue, the imposition of the 5 per cent negligence penalty, relates to all of the petitioners except Hazel Pickens, Docket 29737, and is presented in every proceeding except Dockets 28885, 28886 (Michael and Doris Markovits, 1946), and 29112, 29113 (Edward and Helen Friedland, 1946). The question is whether any part of the deficiencies in Dockets 29738 (Clark Pickens, 1945 and 1946), 30191, 30195 (Helen and Edward Friedland, 1944 and 1945), and 30563, 30564 (Doris and Michael Markovits, 1944 and 1945) is due to negligence, or intentional disregard of rules and regulations but without intent to defraud. Section 293 (a) of the Code. Findings of Fact General. The facts which have been stipulated are found as facts, and the stipulations are incorporated herein by this reference. All of the petitioners are residents of California, and they filed their separate income tax returns on a cash and calendar year basis. The income realized by the petitioners was community income *135 of husband and wife under the laws of California. Each petitioner filed an income tax return for the years involved here within the time allowed by law. Michael and Doris Markovits are husband and wife, as are Clark and Hazel Pickens, and Edward and Helen Friedland. Issue 1. Whether or Not the Respondent's Reconstruction of the Gross Receipts of Four Business Ventures Should Be Sustained Findings of Fact A. Friedland-Markovits Partnership. On about June 20, 1943, Edward Friedland and Michael Markovits formed a partnership to carry on a business of operating bars and retail liquor stores. Each had a 50 per cent interest in the partnership. The partnership filed its income tax returns for calendar year periods, and it kept its books and made its returns on an accrual basis. The partnership was in existence during 1944 and during about nine months of 1945. The partnership was dissolved on September 14, 1945. It filed income tax returns for the calendar year 1944 and for the period January 1 to September 14, 1945. During 1944 and 1945, until about March 23, 1945, the partnership operated a combination bar and retail liquor store located at 744 Broadway, Oakland, which was known *136 as Mac's Place, and a bar located at 2419 Telegraph Avenue, Oakland, which was known as Midway. From February 11, 1944, until May 6, 1944, the partnership also operated another combination bar and retail liquor store located at 1207 Fruitvale Avenue, Oakland, which was known as Myer's Place. Separate books of account were kept for each establishment, but the combined income and expenses of the establishments were reported in partnership returns. The terms "on-sales" and "off-sales" have the following meaning in the liquor business. Sales of drinks over a bar for consumption on the premises are called "on-sales"; and sales of packaged liquor, by the bottle or by the case, for consumption off the premises are known as "off-sales." These terms will be used hereinafter. Michael Markovits was a distillery representative for many years. In November, 1933, after the repeal of prohibition, he became a distillery representative of Eastern Distiller's Syndicate, later known as Schenley Distilleries Corporation. He was associated with Schenley for about thirteen years and during the taxable years involved in this proceeding. His territory was the East San Francisco Bay area where the towns *137 of Richmond and Oakland, in Alameda County, are located. The California State Board of Equalization is the state agency which issues licenses to sell liquor and administers the state laws regulating and taxing sales of liquor. It issues separate licenses for "on-sales" and "off-sales." The State Board of Equalization prohibits ownership of a liquor license by an employee of a wholesale liquor concern. The State Board of Equalization revoked the liquor licenses of Markovits and Friedland, or of their partnership, on March 23, 1945, because of violation of the above-described regulation, whereupon the establishments then operated by the partnership, Mac's Place and Midway, were closed. George L. Courtney, a public accountant, set up an accounting system for Mac's Place, Myer's Place, and Midway and kept the books for each of these establishments. The accounts were set up according to the standard methods of accountancy. The books and bookkeeping records are in existence. Courtney has been engaged in the practice of public accountancy for forty years, and at the time, during the taxable years, that he was looking after the accounting for the liquor business ventures of the petitioners, *138 he also kept books for about 21 other liquor businesses and was acquainted with methods of setting up and keeping books of account for a liquor business. During 1944 and 1945 Millard D. Frazier was employed by the partnership as the manager of Mac's Place and Midway and of Myer's Place while it was being operated. He was a salaried employee. Neither Friedland nor Markovits participated in the daily operations of the establishments. They looked after getting liquor and arranging loans and, from time to time, checked the accounting records. The operations of Myer's Place were carried on and its accounting records and books were kept in the same way as in the cases of Mac's Place and Midway. Because it was in existence for only a few months during 1944, the following facts about operations may be understood as applying to Myer's Place while it was in existence, without repetition of the explanation that it was not operated during 1945 and part of 1944. Mac's Place, Myer's Place, and Midway were equipped with cash registers which had register tapes, as is required by state law. There were three or four cash registers at Mac's Place. The "on-sales" and the "off-sales" were separately *139 kept at Mac's Place and Myer's Place which had both "on" and "off" sales licenses. The "on-sales" and the "off-sales" were rung up on separate cash registers which were separately kept for registering the two classes of sales. It was Frazier's duty to take the readings of all of the cash registers, to check the daily sales and receipts, to make records of the register readings, and to report them to Courtney who kept the books. Frazier performed these duties. Frazier also took the cash from the registers. Frazier had forms listing the daily receipts of each establishment, the register readings, and he gave copies to Courtney, Friedland, and Markovits. Frazier made separate records of the "on-sales" and the "off-sales," and he gave the daily record of each type of sales to Courtney who entered them in the books which he kept for each establishment. Frazier followed the same procedure of taking and reporting the cash register records of sales at Midway where all the sales were bar or "on-sales." The accounting records correctly reported gross sales. The books of account showed that Mac's Place, Midway, and Myer's Place had gross sales in the total amount of $271,951.87 in 1944, and *140 $84,190.65 in 1945. The income tax returns for 1944 and 1945 showed gross sales of $271,951.87 and $95,260.65, respectively. Prior to the trial of this case and in preparation for it, the books and bookkeeping records of Mac's Place, Midway, and Myer's Place were audited by a Certified Public Accountant, Roger Jolly. He did not discover any errors in the accounting records. He compared the tax returns with the books and found that gross sales and cost of goods sold were overstated on the tax return for 1945 in the respective amounts of $11,070 and $18,851.63. His recommendation was that the net amount of $7,781.63 should have been reported as taxable income. In reconstructing the gross sales of Mac's Place, Midway, and Myer's Place, for 1944, the revenue agent accepted as accurate cost of goods sold as reported in the amount of $157,177.41. He reconstructed gross sales, as follows: Merchandise
Inventory *
Net
Sold
January 1, 1944
December 31, 1944
Purchases
Cost of Sales
Liquor
$ 3,432.38
$ 45,141.37
$ 153,373.95
$ 111,664.96
Beer
813.17
10,681.34
36,196.07
26,326.90
Merchandise
367.41
4,832.03
16,339.37
11,874.75
Tobacco
193.37
2,543.18
8,545.57
6,195.76
Water and soda
29.01
381.48
1,467.51
1,115.04
$ 4,834.34
$ 63,579.40
$ 215,922.47
$ 157,177.41
*141 LIQUOR COSTS APPORTIONED 50% ON-SALE 50% OFF-SALE
Cost
Mark-up
Computed
Totals
Sales
On-Sale Liquor
$ 55,832.48
250%
$ 139,581.20
Off-Sale Liquor
55,832.48
200%
111,664.96
Totals
$ 111,664.96
$ 251,246.16
$ 251,246.16
Beer
26,326.90
181.82%
47,867.57
47,867.57
Merchandise, Tobacco, etc.,
19,185.55
133 1/3%
25,580.67
25,580.67
Total estimated sales
$ 324,694.40
Total reported sales
271,951.87
Adjustment
$ 52,742.53
In computing the gross sales of Mac's Place and Midway for 1945, the revenue agent accepted as correct cost of goods sold as reported in the amount of $77,272.09. He reconstructed gross sales for 1945, as follows: Per Cent
of
Gross
Estimated
Total Cost
Costs
Profit %
Sales
On-Sale Liquor
35.5 $ 27,431.59
60%
$ 68,578.98
Off-Sale Liquor
35.5 27,431.59
35%
42,202.44
Beer
16.8 12,981.71
45%
23,603.10
Merchandise
7.6 5,872.68
25%
7,830.24
Tobacco
4.0 3,090.88
75%
4,121.17
Soda
0.6 463.64
25%
618.19
100.0%
$ 77,272.09
$ 146,954.12
Sales Reported
95,260.65
Adjustment
$ 51,693.47
*142 The partnership income tax returns were prepared by Helen Friedland. B. Pickens Liquor Stores. On November 5, 1944, Hazel Pickens, Edward Friedland, and Michael Markovits formed a partnership to conduct the business of operating two retail liquor stores. Each of the partners had a one-third interest in the partnership. The stores were operated under the name of Pickens Liquor Stores, and were located at 925 Broadway, Oakland, and 1425 Franklin Street, Oakland. The store at 1425 Franklin Street was sold in April, 1945. The Pickens Liquor Stores were licensed to engage in the business of retailing packaged liquor. During the fiscal year 1945, the Pickens Liquor Stores discarded 1,925 cases of Mexican Beer for which it had paid $6,044.50. The beer had to be thrown away because it had spoiled. The accounting system for the Pickens Liquor Stores was installed by George Courtney. Standard accounting methods and procedures were followed in keeping the accounting books. The books and accounting records are in existence and constitute an adequate record of business transactions. They consist of a daybook, a check record, and a general ledger. The books and records were kept by *143 June West, a bookkeeper, and Courtney, The partnership filed its income tax returns on an accrual basis and for a fiscal year ending November 30. During the fiscal year ended November 30, 1945, a Mr. Wagner was employed at a salary by the partnership to manage the Pickens Liquor Stores. Pickens, Friedland, and Markovits did not take an active part in the day-to-day operations of the business. Wagner reported each day's total sales to the bookkeeper, who entered them in the daybook. The duties of Courtney with respect to the keeping of the books consisted, among other things, of the monthly posting of the totals for sales from the daybook to the general ledger, the keeping of the general ledger, and the preparation of the partnership tax returns. The accounting records and income tax returns of the Pickens Liquor Stores for the fiscal year 1945 showed gross sales of $186,646.39. Prior to the trial, the Certified Public Accountant, Roger Jolly, audited the books and accounting records of the Pickens Liquor Stores. He compared the books of account with the income tax return. He found that the accountant Courtney had erroneously included in cost of goods sold on the tax return an *144 item in the amount of $11,701.51. The only recommendation which the Certified Public Accountant made was that the amount of $11,701.51 should have been included in the taxable income of the Pickens Liquor Stores for the fiscal year 1945. The gross sales of the Pickens Liquor Stores for the fiscal year 1945 were reconstructed by a revenue agent. In determining gross sales, the revenue agent accepted as correct the amount of $153,461.25 which was reported as the cost of goods sold on the partnership income tax return for the fiscal year ended November 30, 1945. To the amount of $153,461.25, he added a gross profit margin of 25 per cent (based on sales) and computed gross sales to be in the amount of $204,615, which was an increase of $17,968.61 over and above the sales figure reported in the partnership books and tax return. C. Mac's Place. From September 15, 1945 to the end of 1945, Michael Markovits operated the business of Mac's Place as a sole proprietorship. He was licensed to operate Mac's Place as a combination bar and retail liquor store. Markovits purchased the business of Mac's Place from the Friedland-Markovits partnership. He took over the inventory of the business *145 at its cost price. Mac's Place had been closed since March 23, 1945, when the liquor license of the Friedland-Markovits partnership was revoked. It was necessary for Markovits to develop a regular clientele for Mac's Place. After the war ended, liquor supplies became more plentiful, competition increased, and liquor prices declined. Markovits operated Mac's Place at a loss during 1945. Ultimately, he went bankrupt. The accountant, George Courtney, set up the accounting system and kept the books for Mac's Place. The accounts were set up according to the standard methods of accountancy. The books and accounting records are in existence and constitute a complete and adequate record of all business transactions. Gross sales of $14,067.93 were recorded on the books and tax return for 1945. Al Ghiradelli was employed on a parttime basis by Markovits as the cashier of Mac's Place. He was regularly employed by the Bank of America as an assistant cashier. Apart from checking the accounting records each day, Markovits did not participate in the daily operations of Mac's Place. It was Ghiradelli's duty to count the cash, to make the bank deposits, to take readings of the cash registers, *146 to check the daily sales and receipts, to make records of the register readings, and to report them to Courtney who kept the books. Ghiradelli had a daybook in which he recorded the daily sales and receipts of Mac's Place. Once each week he gave the record of sales to Courtney who entered the sales figures in the books which he kept for Mac's Place. A revenue agent reconstructed the gross sales of Mac's Place for the period during 1945, when it was operated as a sole proprietorship by Markovits. He accepted as accurate the cost of goods sold as reported by Markovits in the amount of $12,844.79, and determined that gross sales were $17,126.38 based on a mark-up on sales of 25 per cent. D. Denver Club. On April 1, 1944, Hazel Pickens, Edward Friedland, and Michael Markovits formed a partnership for the purpose of operating the business of a combined bar and retail liquor store in Richmond, in Alameda County. The partnership purchased a going business known as the Denver Club, which it operated from about May 1, 1944, until November 27, 1945. The Denver Club was sold by the partnership on November 27, 1945, and the partnership was dissolved in 1946. The partnership interests were *147 as follows: Hazel Pickens, 50 per cent; Edward Friedland, 25 per cent; and Michael Markovits, 25 per cent. The Denver Club kept its books and filed its income tax returns on an accrual basis and for fiscal years ending on March 31. The issue presented relates to two fiscal years ending on March 31, 1945, and March 31, 1946. The business of the Denver Club was acquired by the partnership in 1944 for $15,000. An additional amount of $11,000 was expended to remodel the premises. During 1944 and 1945, the Denver Club was managed by Clark Pickens. He was not a member of the partnership. Neither Hazel Pickens, Friedland, nor Markovits participated in the day-to-day operations of the Denver Club. Friedland and Markovits looked after getting liquor supplies. The Denver Club was centrally located in Richmond at 627 MacDonald Avenue, near several large shipyards which were in full operation during 1944 and most of 1945. The Denver Club was licensed to sell drinks over the bar and packaged goods, by the bottle and case, for consumption off the premises. Whiskey, beer, wine, and soft drinks were sold. The premises on which the business of the Denver Club was conducted measured about 80 feet *148 in length and 20 feet in width. The bar extended about 60 feet down the length of the premises. At the front of the store was a counter, approximately 7 feet long, at which sales of packaged goods were made. Although liquor was scarce during the war years, the Denver Club was able to maintain a sufficient liquor inventory to supply the demands of its customers during 1944 and 1945. There was no limit placed by the Denver Club on the quantity of packaged goods which a customer could purchase, except for the 5-gallon limitation imposed by the law of California. The "off-sale" department was open for business daily from 10:00 A.M. to 8:00 P.M. The "off-sale" business was handled by one clerk, except during rush hours when Pickens and the head bartender assisted in that department. Packaged goods by the bottle were sold unwrapped directly from the case. In its "off-sale" department, the Denver Club cashed payroll checks for its customers. The "on-sale" department was open for business daily from 10:00 A.M. to 12:00 midnight. Besides the head bartender, there were from 2 to 4 bartenders on duty at all times. One man was employed to watch the bartenders in order to prevent their taking *149 money and liquor. At various times bottles of liquor were dropped and broken and their contents lost. The Denver Club was required to handle some inferior brands of liquor in order to obtain its supply of well known Schenley brands. This liquor was sold to retail customers at cost price. Newspaper advertisements were used to promote the sale of the inferior liquor. The Denver Club also advertised that it sold the popular brands of liquor at O.P.A. ceiling prices. The accounting system for the Denver Club was installed by George Courtney, the accountant. Standard methods and procedures of accountancy were followed in setting up the accounts. The books of the Denver Club consisted of a daybook, a check record, and a general ledger. The books were kept by the bookkeeper, June West, and Courtney. The books were stolen in 1947 and were not in existence at the time of the revenue agent's audit or at the time of the trial of these proceedings. The accounting records which are still in existence are: monthly financial statements, except for June and November, 1944; duplicate copies of the daybook and check record for the period May through November 1945; bank statements, cancelled checks; *150 and the accountant's work sheets which were made from the books. The work sheets were used by the accountant in preparing the income tax returns of the Denver Club. The work sheets showed in summary form the accounts which had been kept of the business transactions of The Denver Club for the fiscal years ending in 1945 and 1946. The method of accounting was, on the whole, adequate. However, certain inter-store transfers of merchandise, and accommodation sales of liquor at cost, both of which were handled by Clark Pickens, were not entered on the books and were not reflected in the work sheets. The "off-sale" department of The Denver Club had one cash register and the "on-sale" department had three or four registers. They were equipped with register tapes. When a sale was made, the amount of the sale was rung up on the cash register, and the cash was placed in the register. The "on-sales" and "off-sales" were rung up on separate cash registers which were separately kept for registering the two classes of sales. At the close of business each day or on the morning of the following business day Pickens, with the assistance of the head bartender, would take the readings of all of the *151 cash registers, count and reconcile cash, make separate records of the register readings in the "on-sale" and "off-sale" departments, and transmit them to the bookkeeper. Pickens also deposited the checks on hand in a nearby bank. Cash was retained for the purpose of cashing checks. Pickens would total "on-sales" and "off-sales" separately, and would report each type of sales separately to the bookkeeper who would enter the two daily totals in the properly designated columns of the daybook. At the end of each month, Courtney totalled the "on-sales" and "off-sales" columns, and posted the totals to the general ledger. Each month he prepared financial statements, in which he estimated the cost of each dollar of "on-sales" to be 40 cents, and the cost of each dollar of "off-sales" to be 70 cents. This was the average cost experience of the other liquor establishments for which he kept books. At the end of the fiscal year when physical inventories were taken, the cost figures were adjusted on the books to reflect actual rather than estimated amounts. Purchases and inventories were not segregated on the accounting records with respect to "on-sales" and "off-sales." The accountant's *152 work sheets and the income tax returns for the Denver Club reported gross sales of $507,138.21 and $397,783.38 for the fiscal years ending during 1945 and 1946, respectively. A revenue agent, upon auditing the partnership's returns for the 1945 and 1946 fiscal years reconstructed the gross sales of the Denver Club for the fiscal years 1945 and 1946. At the time he made the audit, the books of the Denver Club were not available; they had been stolen. In making his computation for 1945, the agent accepted as correct the cost of goods sold in the amount of $385,530.86, as reported on the partnership tax return. In order to arrive at a cost figure for each class of merchandise sold, the agent allocated the total amount of the cost of all goods sold, $385,530.86, as follows: 92 per cent, or $354,688.39 to liquor; 7 per cent, or $26,987.16, to beer and wine; and 1 per cent, or $3,855.31, to miscellaneous. He then allocated the estimated cost of liquor sold in the amount of $354,688.39, as above described, as follows: 50 per cent, or $177,344.20, to "on-sales"; 30 per cent, or $106,406.51, to "off-sales" by the case; 10 per cent, or $35,468.84, to "off-sales" in bottles; and 10 per cent, *153 or $35,468.84, to the inferior brands of liquor sold at cost to retail customers. The agent computed estimated gross sales to be $832,553.48, which amount represented an increase of $325,415.27 over and above the total sales reported on the tax return. The agent arrived at his amount of gross sales by applying various percentage markups to the classes of merchandise sold. The agent's computations were as follows: Margin of
Class of
Estimated
Gross Profits
Estimated
Merchandise
Cost
%
Based on Sales
Sales
Liquor "on-sales"
$ 177,344.20
65%
$ 506,697.71
Liquor "off-sales" in case lots
106,406.51
40%
177,344.18
Liquor "off-sales" in bottles
35,468.84
92%
26%
47,930.87
Liquor at cost
35,468.84
35,468.84
Beer and Wine
26,987.16
7%
55%
59,971.47
Miscellaneous
3,855.31
1%
25%
5,140.41
$ 385,530.86
100%
53.59% *
$ 832,553.48
In reconstructing gross sales for the fiscal year ending in 1946, the agent accepted as correct the cost of goods sold as shown by the return, of $336,192.05. In order to arrive at the cost figures for each class of merchandise sold, the agent allocated *154 the total cost of $336,192.05 among the various classes of merchandise as follows: liquor, 92 per cent, or $272,489.73; beer and wine, 7 per cent, or $20,732.91; and miscellaneous, 1 per cent, or $2,961.85. The cost of all liquor, $272,489.73, was in turn allocated as follows: "on-sales", 40 per cent, or $108,995.89; "off-sales" by the case, 40 per cent, or $108,995.89; "off-sales" by the bottle, 10 per cent, or $27,248.97; and sales at cost to retail customers, 10 per cent, or $27,248.97. The agent computed gross sales for the fiscal year 1946 to be $537,684.99, which amount represented an increase of $139,901.61 over and above the total amount of sales reported on the tax return. The agent computed the amount of gross sales by applying various percentage mark-ups to each type of merchandise sold, as follows: Margin of
Class of
Estimated
Gross Profits
Estimated
Merchandise
Cost
%
Based on Sales
Sales
Liquor "on-sales"
$ 108,995.89
60%
$ 272,489.72
Liquor "off-sales" in case lots
108,995.89
30%
155,708.42
Liquor "off-sales" in bottles
27,248.97
92%
26%
36,822.93
Liquor at cost
27,248.97
27,248.97
Beer and Wine
20,732.91
7%
50%
41,465.82
Miscellaneous
2,961.85
1%
25%
3,949.13
Totals
* $ 296,184.49
100% ** 44.91%
$ 537,684.99
*155 In 1946, when all of the books of the Denver Club were in the possession of the partnership, the California State Board of Equalization audited the books of The Denver Club and Pickens Liquor Stores in the course of its administration of the state laws taxing sales of liquor. The Board's auditor found that the sales of liquor, per books, "off-sales" and "on-sales", were duly accounted for, and the sales tax returns as filed were accepted. Shortly before the trial by this Court of these proceedings, Roger Jolly, a certified public accountant, audited the available records of the Denver Club for the fiscal years ending in 1945 and 1946, and he found that there were some discrepancies between the records of the Denver Club and the tax returns, as follows: The cost of goods sold was overstated in the partnership return for the fiscal year ending in 1945 in the amount of $8,687.12, which resulted in understatement of income in the amount of $8,687.12. Also, he found that gross income was understated in the partnership return for the fiscal year ending in 1946 in the amount of $21,120.66. He found further, that *156 during the fiscal year ending in 1946, Courtney had erroneously credited the partners' capital accounts on the books in the amount of $51,648.57, [2] although no additional capital was, in fact, contributed by the partners. This amount should have been credited to a profit and loss account for the fiscal year ended March 31, 1946. The entry was made to eliminate a cash deficit on the books which was caused by the failure of Pickens to report to Courtney the facts concerning the inter-store transfers of liquor. Pickens transferred at cost liquor from the inventory of the Denver Club to the Pickens Liquor Stores and other liquor establishments in which he and his wife had an interest. He also sold liquor at cost to other liquor dealers whose stocks had been depleted. He deposited the funds received for this liquor in the Denver Club's bank account. Pickens did not report these cost transactions to Courtney, and they were not entered on the books. Jolly recommended that the taxable income of the Denver Club for the fiscal year ending in 1945 should be increased in the amount of $8,687.12; and that for the fiscal year ending in 1946, it *157 should be increased in the amount of $72,769.23, the total of the two adjustments in the respective amounts of $21,120.66 and $51,648.57. The adjustments recommended by Jolly upon the re-audits of the available accounting records of The Denver Club for its 1945 and 1946 fiscal years provide a reasonable and adequate adjustment of errors made by Courtney, and of the effect of Pickens' failure to give Courtney records of the at-cost transfers of merchandise. The accounting errors of Courtney and the transfers of merchandise a cost by Pickens do not require disregard of the accounting records of gross receipts of The Denver Club from "on-sales" and "off-sales" during the taxable years. The accounting records of The Denver Club's "off-sales" and "on-sales" during its fiscal years ending in 1945 and 1946 were adequate and properly recorded gross receipts from "on-sales" and "off-sales." The accounting records which were kept for the three partnerships - The Denver Club, Friedland and Markovits, and Pickens Liquor Stores, and for Mac's Place, were adequate and reasonably correct. They properly recorded the gross receipts of each business, including the gross receipts from "on-sales" *158 and "off-sales." None of the business enterprises - Mac's Place, The Denver Club, Friedland and Markovits, or Pickens Liquor Stores received gross income during the taxable years involved in these proceedings in the total amounts which the respondent's agents determined by use of certain percentage mark-ups and by making reallocations of merchandise to the various types of sales in total disregard of the accounting records of sales and gross receipts of each business. Opinion In these consolidated proceedings, the first issue relates to the determination of the gross income of a sole proprietorship business, Mac's Place, during the taxable year 1945; and to the determination of the gross income of three partnerships, The Denver Club, 1945 and 1946; Pickens Liquor Stores, 1945; and the Friedland-Markovits partnership, 1944 and 1945. The respondent's determinations with respect to the gross income of The Denver Club for its 1945 and 1946 fiscal years present the major part of the dispute. The respondent, in general, has disregarded the computations of the petitioners of the gross receipts of each business, set forth in income tax returns, which reflected the records thereof in *159 the regularly kept books of each business, and under section 41 of the Code he has reconstructed the amounts of the gross sales of each business by use of the percentage or mark-up method. The respondent has accepted the petitioners' costs of goods sold. The crux of the controversy is whether the petitioners reported correctly in the gross income of each business the "on-sales," or bar sales; and the "off-sales," or sales of packaged merchandise. The effect of the respondent's determinations has been to charge the petitioners with having had a greater volume of "on-sales" than of "off-sales." The respondent has rejected the accounting records of each business as they show the volume of "off-sales" and of "on-sales." He has not only applied high percentages of costs as the mark-up for computing gross receipts, but he has applied, also, percentages to merchandise which result in a reallocation of merchandise to "on-sales," to "off-sales," and to "off-sales" of cases of merchandise so that the volume of "on-sales" has been increased and the volume of "off-sales" has been decreased from that which is shown by the accounting records of the business ventures involved. The petitioners contend *160 that the respondent's determinations are arbitrary and without foundation in facts. The lengthy record in these proceedings has been fully and carefully considered. Since the respondent did not introduce any evidence in support of his determinations, the record which was made upon the respondent's cross-examination of petitioners' witnesses has been analyzed with care. With respect to The Denver Club, it is concluded that the respondent, by the use of his method of reconstructing its gross sales for the taxable years involved, has determined an excessive amount of gross receipts; that the "on-sales" were not as great as the respondent determined; and that the mark-up of all merchandise sold was not as large as that adopted by the respondent's agent. It is concluded that the petitioners involved in The Denver Club partnership, through the pre-trial audit made by Jolly, have established a reasonable basis for dealing with the interstore transfers of merchandise at cost, and the accommodation sales to other liquor stores by Pickens, and that these so-called "at cost" transactions in the taxable years do not provide a basis in fact for disregarding the accounting records, which were *161 made from daily reports, of the receipts from "on-sales" and of the receipts from "off-sales". The petitioners concede that the income tax returns of the partnership which operated The Denver Club understated its income for the fiscal years ending in 1945 and 1946, chiefly because of Pickens' failure to give the accountant, Courtney, records of the "at cost" transfers of merchandise, and that therefore there are some deficiencies in taxes owing for the taxable years. But these concessions of the petitioners of the errors of Courtney in reflecting properly some of the accounts in the books of The Denver Club in his making the tax returns have been made as the result of re-audits by the petitioners of the available accounting records of The Denver Club, and the re-audits have not in our judgment provided sound reasons for disregarding the figures reported for the receipts from "on-sales" and "off-sales," respectively. It is true that Pickens' handling of the "at cost" transfers of merchandise were slipshod. But the errors made thereby are reasonably corrected in the manner recommended by the accountant, Jolly, with some resulting tax deficiencies. The petitioners, at least, have introduced *162 evidence which is sufficient to shift the burden of going forward to the respondent. See Kern v. Poe, 8 Fed. Supp. 942; B. F. Edwards, 39 B.T.A. 735; Federal National Bank of Shawnee, Oklahoma v. Commissioner, 180 Fed. (2d) 494. Since the respondent has failed to establish by evidence any factual basis for the very substantial increases in the gross sales of The Denver Club which he has determined by adopting high percentage mark-ups which are unexplained in the record, and by making adjustments between the volume of "on-sales" and "off-sales" which are unsupported by fact, we cannot sustain his determinations with respect to The Denver Club. With respect to The Denver Club, there are in evidence, monthly accounting reports of that partnership's accountant, for every month except June and November of 1944, which show the amounts of "on-sales" and "off-sales." The record contains testimony, which is not discredited, of how records were made on cash register tapes of "on-sales" and "off-sales"; of how daily records were kept of all sales; and of how the accounts were regularly kept according to standard accounting procedures. We do not find *163 in the entire record of these proceedings facts which provide ground for not accepting as true the testimony of the petitioners' witnesses. The loss of certain accounting books of The Denver Club introduced an element of doubt and provided a reason for suspicion, but the petitioners have introduced evidence which overcomes much of the doubt engendered by the loss of certain books of account. The monthly accounting statements and the accountant's work sheets which were made from the books which were lost, which are in evidence, constitute accounting records which must be given consideration, and they now are the best evidence. We believe that these monthly statements and work sheets truly reflect the entries in the stolen accounting books. Aaron Samuelson, Executor, 10 B.T.A. 860; Alfred A. Nahman, 21 B.T.A. 121. In the instance of The Denver Club, therefore, there is evidence of the regularly kept accounts of the business which cannot be disregarded as the respondent has done. Furthermore, there is evidence to the effect that before the accounting books were stolen, the auditors of the California State Board of Equalization audited the books and for the *164 purpose of State taxation accepted the records of "off-sales" and of "on-sales" shown by the books. It is not necessary to conclude that the respondent's reconstruction of the gross income of The Denver Club involved an arbitrary method, Helvering v. Taylor, 293 U.S. 507, but it is concluded that the petitioners have introduced evidence which overcomes the prima facie correctness of the respondent's determinations relating to reconstruction of the gross receipts of The Denver Club. In the conduct of the business of Mac's Place, the individual proprietorship, and of the partnerships of Friedland-Markovits and Pickens Liquor Stores, accounting records were kept regularly and they are in existence and were available to the respondent's agent in his audits of the income tax returns of those business ventures. They were available for purposes of the trial of these proceedings. As in the case of The Denver Club, the respondent's determinations were made upon a reconstruction of the gross receipts of each business in which he determined that the percentages of merchandise sold, respectively, in the "on-sale" and "off-sale" departments (in the businesses which made bar sales) *165 were different than the accounting records showed. Also, the respondent reconstructed the gross receipts of each business by the method of applying percentage of cost mark-ups which were larger than the accounting records indicated. The evidence relating to each of these business operations is sufficient to support the conclusion that the accounting records of sales of all classes should not be ignored. From consideration of all of the evidence, we do not find facts which contradict or discredit the testimony of petitioners' witnesses, and their testimony cannot be disbelieved. Ross Bowman, 17 T.C. 681. There were transfers of merchandise at cost from The Denver Club to the Pickens Liquor Stores by Pickens, and the respondent questions the reliability of the accounting records of the Pickens Liquor Stores because Pickens failed to give records of the transfers to the accountant and bookkeeper. Again, Pickens' disregard of the necessity for making records of these transfers constituted great lack of care but under the general issue, the question is whether these transfers of merchandise require complete disregard of the records made from cash register tapes of "on-sales" *166 and "off-sales." Pickens was unacquainted with and ignorant of the accounting procedures applicable in the conduct of the business. His errors in this matter were serious and have created doubts. But they constitute one circumstance to be considered along with all of the evidence. The petitioners, through the re-audits of the accounting records made by Jolly, have provided a reasonable method for adjusting the error. The audits of the books of Pickens Liquor Stores by the California State Board of Equalization did not reveal error in the "on-sales" and "off-sales" records of Pickens Liquor Stores, and provide evidence in support of the regularly kept records thereof. It is concluded that the accounting records of the Pickens Liquor Stores should not have been completely ignored. It is concluded, also, that the concessions of the petitioners, upon Jolly's reaudits of the accounting records of the two partnerships under consideration here, do not provide sufficient reason for not giving recognition to the records of "on" and "off" sales. The accountant, Courtney, made some errors in reporting the net taxable income of each of the two partnerships but these have been satisfactorily *167 explained. The evidence of the petitioners is sufficient to shift the burden of going forward to the respondent, Kern v. Poe, supra; and the respondent has not established by any evidence of his own or by his cross-examination of the petitioners' witnesses that the accounting records of Mac's Place and of the Friedland-Markovits and Pickens Liquor Stores should be wholly ignored. We are unable to sustain the respondent's reconstruction of the gross income of these business operations. At the trial of these proceedings, respondent's counsel agreed that if this Court did not sustain respondent's reconstruction of the gross income of the four business operations, effect would be given under Rule 50 to the concessions of the petitioners that there were errors made in the income tax returns filed for the three partnerships. It is observed that the corrections to be given effect under Rule 50 are made on the basis of the accounting records of the partnerships which the petitioners have had re-audited, and upon evidence adduced in the trial of these proceedings. Under Rule 50, recomputation will result in deficiencies in taxes in lesser amounts than resulted from the method *168 employed by the respondent in reconstructing the gross income of each business. Issue 2. Overcharges Paid to O.P.A. Findings of Fact Before the partnership purchased the Denver Club, it was owned and operated by Carl Thomas and he sold, in addition to liquor, bottled beer. The partnership took over the business as it had been operated, retaining employees of Thomas. Thomas charged 25 cents per bottle for beer, and for about two weeks the same price was charged under the management of Pickens. The partnership advertised in newspapers that it sold merchandise at O.P.A. prices. Pickens went to the local O.P.A. office in Richmond, at about the end of the first two weeks of the partnership's operation of the Denver Club to file the list of prices which were to be charged. The price of bottled beer was listed at 20 cents per bottle on the list of prices filed with O.P.A. No draft beer was to be sold. Pickens was told by the local O.P.A. office that the listed price for a bottle of beer - 20 cents - was all right, and beer was sold at the Denver Club at that price. The list of prices so approved by the local O.P.A. office, the same list as was filed with O.P.A., was posted on the premises *169 of the Denver Club. At some time later, the Price Administrator sent a letter to Pickens to appear before the local O.P.A. board, and he was told that the O.P.A. ceiling price for bottled beer of the former owner was 16 cents per bottle, that he was required to charge the same price and that on this basis overcharges for beer by the Denver Club amounted to $8,576.20. It was impossible for Pickens to make refunds of the overcharge of 4 cents per bottle to customers, and so he made payment of the overcharges to the United States by delivering a check to the local office of O.P.A. Pickens did not know that Thomas had sold beer for 16 cents a bottle, or that the ceiling price under O.P.A. regulations on beer sold by the Denver Club under his management should have been 16 cents a bottle; and he was not so advised by the local office of O.P.A. when he filed the list of prices to be charged by the Denver Club with the office of O.P.A. The overcharges by the Denver Club for bottled beer were made unitentionally, inadvertently, innocently, and were not due to an unreasonable lack of care. Opinion The question under this issue is whether a payment to the United States of $8,576.20 *170 overcharges may be deducted under section 23 (a) (1) (A) of the Code as an ordinary and necessary business expense. This Court, in Farmers Creamery Co. of Fredericksburg, Va., 14 T.C. 879, recognized the proposition "that where the overcharge is insignificant in amount, inadvertent and unintentional, and voluntarily disclosed," the deduction may be allowed, Henry Watterson Hotel Co., 15 T.C. 902, 905, and in so holding we followed Rossman Corporation v. Commissioner, 175 Fed. (2d) 711. See also, Pacific Mills, 17 T.C. 705, 718. The taxpayer has the burden of proving that the overcharges were inadvertent and unintentional and that they were not made through an unreasonable lack of care. Upon the evidence before us, which stands uncontradicted and unimpeached, we have found that the overcharges by the Denver Club for bottled beer were inadvertent and unintentional, and were not due to an unreasonable lack of care. It is held, therefore, that the partnership is entitled to deduct in the fiscal year ending March 31, 1946, under section *171 23 (a) (1) (A), $8,576.20. Pickens, who testified and was observed by the Court, acted with reasonable care in making his original inquiry at the local O.P.A. office about the ceiling price for beer for the Denver Club; in filing with O.P.A. the price for beer which would be charged; and in obtaining approval of the price for beer on the list of prices filed. The violation consisted of violating a ruling that the ceiling price, for beer, which applied to the former owner of the Denver Club, applied to the price to be charged by the new owners, the partnership. Pickens was not aware of the ruling, and was not told about it when he went to the local O.P.A. office to obtain approval of the list of prices which he filed. In cross-examining the witness, Pickens, the respondent failed to establish that Pickens willfully violated a somewhat technical ruling. We conclude that the violation, under the circumstances here present, was not willful and intentional because the evidence before us shows that Pickens made a reasonable effort to ascertain what price under O.P.A. regulations the Denver Club properly could charge for bottled beer. The evidence here does not show that the overcharge *172 for bottled beer was deliberately and knowingly made, cf. National Brass Works, Inc., 16 T.C. 1051, and explanation has been made that the manager of the Denver Club believed that the price charged was correct under the requirements of the O.P.A. as far as he could learn from its local office, cf. Henry Watterson Hotel Co., supra.
Issue 3. Expenditures for Renovation of Pickens' Property Findings of Fact In January, 1945, the petitioners Hazel and Clark Pickens purchased property at 826 Broadway, Oakland, California, where a building was located. The building was divided into stores on the ground floor and a rooming house on the second floor comprising 30 rooms. Prior to the purchase of the property the Pickens rented one of the store spaces on the ground floor where they operated the Arena Bar. They did not have a lease covering the space occupied by the Bar. Their license to operate the Bar was valuable, and the location for that business was good. They learned that the owner of the building contemplated selling the building. Fearful that a new owner might not continue to rent the store space to them, they arranged to purchase the entire building *173 in order to protect their liquor license and liquor business. After they purchased the building they continued to occupy the store space where their bar was located and to carry on their liquor business there. They did not intend to and did not operate any other business on the premises. They rented to others all of the building except the space occupied by the Arena Bar. The previous owner of the building had leased the upstairs rooming house area to an individual who carried on a rooming house business. When the Pickens purchased the property the lessee gave up his lease, removed his furniture, and the rooming house area became vacant. It was necessary to clean and repair the rooming house part of the building. During 1945 the petitioners expended $548.13 for alterations which involved moving a partition to enlarge a bathroom and to put in two more bathrooms. The expense incurred for this remodeling work constituted a capital expenditure. During 1945 the petitioners redecorated the 30 rooms in the rooming house area. The rooms were repapered and repainted. The purpose of this work was to clean the quarters and maintain them in good condition. The repapering work involved taking *174 the old paper off the walls of all of the rooms and the halls. After the paper was taken off the walls the electric wiring was replaced by electricians to eliminate possible fire hazard. Plastering work was done in connection with the rewiring. The repapering and repainting work was necessary in order to keep the property in a clean and serviceable condition. The expenditures for that purpose were ordinary expenses and were not capital expenditures. A reasonable allowance for the painting and repapering work is $1,500. The expenditures for rewiring the premises fell in the class of alterations and improvements which prolonged the life of the property and were capital expenditures. A reasonable allowance for the rewiring, electrical work, is $1,400. Opinion The petitioners contend that the total expenditures incurred in renovating the rooming house area of the Broadway property, $3,448.13, were not capital expenditures, that they were ordinary expenditures for repairs and maintenance of the property, and that they are deductible as nonbusiness expenses under section 23 (a) (2) of the Code. The respondent contends that all of the expenditures in question were capital expenditures. *175 The parties are agreed that if all or part of the expenditures were not in the nature of capital expense, deduction is allowable under section 23 (a) (2). No issue is raised with respect to the application, if any, of section 23 (a) (1) (A). The question presented is a question of fact. The distinctions which differentiate expenditures for repairs from expenditures for alterations, improvements, or additions are well known and need not be restated. Cf. Union Pacific RR Co. v. United States, 99 U.S. 402, 420; Federal-American National Bank, 9 B.T.A. 1043, 1045; H. S. Crocker Co., Inc., 15 B.T.A. 175. Under the established rule, the cost of moving a partition to enlarge a bathroom or to make an additional bathroom and the cost of rewiring the electrical system are capital expenditures and are not deductible. On the other hand, the cost of painting and repapering was an ordinary expense which was required to keep the premises in a clean and useful condition, and they constituted ordinary expenses. H. S. Crocker Co., Inc., supra; Chesapeake Corporation of Virginia, 17 T.C. 668, 675. *176 The petitioners have failed to clearly show the respective costs of the electrical rewiring and of the painting and repapering, but we have made an approximation of the respective costs and have found that the painting and papering expenditures amounted to $1,500, and that the rewiring work amounted to $1,400. Cohan v. Commissioner, 39 Fed. (2d) 540. Accordingly, it is held that the petitioners are entitled to an expense deduction in the amount of $1,500. It is held further that the respondent correctly disallowed deduction of capital expenditures in the respective amounts of $1,400 and $548.13. The petitioner, Clark Pickens, testified that other work was done on the Broadway property which involved reroofing and work on the plumbing system; and that the outside of the property was painted. Respondent has incorrectly understood this witness with respect to the expenditures for the above work. Those expenditures are not included in the two amounts which are involved under this issue. Issue 4. Claims of Edward Friedland for Deductions for Business Expenses and Losses Findings of Fact Edward Friedland was engaged in the liquor business during 1945 until September. *177 During 1946, he was engaged in a general business of a promoter. His business involved developing new business enterprises for the purpose of making profit. During 1946, he devoted all of his time to such business activities. He entered into some ventures with others. Some business ventures did not progress beyond preliminary stages and were abandoned when it became evident that they would not be profitable; and some activities developed to the point of production. The undertakings were bona fide business ventures in which Friedland incurred and paid business expenses which were ordinary and necessary and in which he sustained losses in 1946. It is agreed that the petitioner was engaged in an advertising business in 1946 from which he received income of $3,375.50; and incurred and paid business expenses of $2,213.33. Friedland, in the pursuit of his general business of promoting new business ventures, engaged in the following business ventures during 1946: the development of a new business of acting as agent and broker for the purchase of steel products, lumber products, and building materials; the purchase of a tavern known as the "107 Club" in east Oakland, California; the procurement *178 of an agency to sell new automobiles, in connection with which a lease called the Broadway lease was obtained on space where an automobile agency business would be conducted; the purchase of a tract of land located in Hayward, California, for subdivision into lots; the making of liquor from fruit pulp; the preparation and sale of a consensus of horses likely to win horse races; the building and operation of a race track at Pleasanton, California. During 1946 Friedland rented an office in Oakland where telephones were installed and where he employed a secretary. From this office he carried on all of his general business activities. Sixty-five per cent of the telephone expense was business expense. Friedland, hereinafter called the petitioner, incurred and paid ordinary and necessary business expenses in the operation of his office consisting of rent, salary for a secretary, typewriter rental, repairs, costs of stationery, mimeographing, bottled water, and miscellaneous items in the total amount of $1,045.79. Also, the petitioner expended $100 for an adding machine which represented a capital expense. The petitioner incurred and paid local and long distance telephone expense at his *179 office during 1946. He used the telephones at his office in connection with all of his business activities during 1946. Sixty-five per cent of the total amount which he expended for telephone service amounted to $1,139.60, which amount was deductible as ordinary and necessary business expense. In connection with all of his business activities during 1946, the petitioner drew checks for the payment of expenses while traveling away from Oakland in pursuit of his business. Incomplete records were kept of these expenditures consisting of hotel bills, covers of airplane tickets, stubs of other transportation tickets, and cancelled checks. However, many of the checks drawn by the petitioner were made payable to cash and no record was kept to show the amounts and nature of the expenses paid with cash. No record was kept of cash expenditures for business entertainment expense. On or about May 17, 1946, a prospective buyer of lumber, Maroosis, accompanied the petitioner on a trip to Los Angeles to obtain douglas fir lumber which Maroosis believed could be purchased from brokers. Maroosis agreed to pay petitioner a commission of 5 per cent if lumber was purchased. The petitioner spent $200 *180 for hotel and traveling expenses during this trip. He did not receive a commission because he and Maroosis were unable to purchase any lumber. The expenditure of $200 was an ordinary and necessary expense in the pursuit of a business of acting as a broker in the purchase of steel, lumber, and building materials. The evidence does not establish that other alleged expense in the amount of $878.65 was business travel or entertainment expense. During 1946 the petitioner incurred and paid traveling expenses, exclusive of automobile expense, in the total amount of $1,400.26, as follows: Hotel expenses
$ 535.31
Transportation, meals
634.00
S. R. Thompson
230.95
$ 1,400.26
All of the expenses in the above amounts were ordinary and necessary expenses of petitioner's business during 1946. The hotel, transportation, and meals expenses were paid while traveling away from home in the pursuit of the petitioner's business. Such traveling consisted of trips to Los Angeles and to Reno, Nevada. Cancelled checks, hotel bills, and retained stubs of transportation tickets substantiate the expenses to the extent of $535.31 and $634. There is no evidence to substantiate petitioner's *181 claim that checks made payable to "cash", aggregating $1,811.65, represented the expense of business travel. During 1946 the petitioner engaged the services of S. R. Thompson to locate stumpage and peeler logs for plywood, and he agreed to pay Thompson's traveling expenses. Thompson traveled about the country in his automobile. The petitioner paid him $230.95 to reimburse him for his traveling expenses. The payment of the above amount to Thompson was an ordinary and necessary expense of the petitioner's lumber and steel products brokerage business. During 1946 the petitioner made an arrangement with Paul Clink to pay him a commission for locating stumpage for plywood and to reimburse him for his traveling expenses. The petitioner paid Clink $80.96 for his automobile expenses. This expenditure constituted an ordinary and necessary expense in the conduct of petitioner's steel and lumber products brokerage business. The petitioners spent $92.44 for repairing the automobile which he used in making trips in pursuit of his several business activities, and the expenditure was an ordinary and necessary business expense of his general business. The total amount of automobile business expense *182 consisting of these two items was $173.40 during 1946. The petitioner's residence during 1946 was located in Orinda, Alameda County, which is a far distance from the business section of Oakland. The petitioner used an automobile going between his home and his office. During 1946 there were 3 automobiles in the Friedland family which were used, at least part of the time, for the family's needs. The petitioner's son, Bob, signed several service station bills for the purchase of oil, gasoline, and repairs. The petitioner did not keep records of his expenditures for oil, gasoline, and repairs for automobiles which he used in his business during 1946, and he has been unable to prove that the total amount of automobile expenses claimed were business expenses, other than the total amount of $173.40, set forth above. The evidence does not substantiate petitioner's claim for additional automobile expense in the conduct of his business activities in the amount of $585.31, which was personal expense. The petitioner sustained losses in business ventures which he entered into for profit during 1946. He sustained losses in 1946 as follows: A. Bad debt of Mrs. Carter
$ 3,500.00
B. Loss from a forged check
37.15
C. 107 Club loss - option deposit
166.66
D. Broadway lease - option deposit
loss
710.60
E. Hayward acreage, loss on op-
tion deposit
333.33
F. Fruit liquor venture
1,765.50
G. Horse censensus venture
1,750.00
H. Pleasanton Race Track - loss on
option deposit
1,000.00
I. Pleasanton Race Track - fees
596.00
*183 A. Indebtedness of Mrs. Flora Carter. On April 30, 1946, Friedland loaned Mrs. Flora M. Carter $4,000 and received her promissory note in the same amount which was due 21 days thereafter. Mrs. Carter told Friedland that she owned lumber mills in Santa Rosa and Auburn, California, and that if Friedland would loan her $4,000, she would give him an exclusive agency for the lumber produced at her lumber mills. Later, Mrs. Carter made payment on her note by giving Friedland a check. The check was returned by the bank because of lack of funds to cover the check. Friedland located Mrs. Carter in Sacramento and made demand upon her to pay her debt. An agreement was made, dated July 7, 1946, under which she promised to deliver to Friedland within 10 days, lumber having a value of $4,000. In a separate agreement of the same date Mrs. Carter agreed to assume an indebtedness of Lewis to Friedland in the amount of $500 and to deliver $500 worth of lumber to Friedland in satisfaction of the indebtedness of Lewis. Mrs. Carter failed to deliver lumber to Friedland, but she paid $1,000 on her indebtedness after July 7, 1946, leaving a balance of $3,500. On or about October 20, 1946, Friedland *184 instituted an action in the Superior Court for the County of Alameda against Mrs. Carter upon her indebtedness of $3,500. The address of Mrs. Carter was unknown after July 7, 1946. Friedland employed an investigator to locate Mrs. Carter and to find out whether her assertion that she owned lumber mills was true. During 1946 search was made for Mrs. Carter at Long Beach, Los Angeles, and Sacramento, California, and in Reno, Nevada; but Mrs. Carter could not be located. The investigator learned that Mrs. Carter's representation that she owned one of the mills was false. The investigator was unable to locate assets or bank deposits of Mrs. Carter. Mrs. Carter was "bankrupt" in 1946. Judgment was obtained against Mrs. Carter for the indebtedness of $3,500 on December 13, 1946. Writ of execution of the judgment was returned unsatisfied in 1947. In 1946 Mrs. Carter was indebted to Friedland in the amount of $3,500. Her indebtedness arose from a bona fide loan of Friedland to her in the amount of $4,000 and upon valid assumption by her of indebtedness to Friedland of another in the amount of $500. The indebtedness of $3,500 represented a business bad debt, which became worthless in 1946.
*185 B. Loss on a Forged Check. During 1945, Friedland was a partner with Michael Markovits in the operation of a bar and a liquor store known as Mac's Place and Midway. The partnership was dissolved in 1945, and the petitioner realized long-term capital gain in an amount in excess of $500. During 1945 a United States Treasury check for $37.00, made payable to an individual named Sylvia Earlie Johnson, was cashed at either Mac's Place or Midway. It was customary at both places of business to cash checks for customers. Endorsement of the check in the name of Sylvia Earlie Johnson was a forgery, and the Treasury check was returned in May, 1946, by the United States Treasury which refused payment because of the forgery. When the check was returned the Friedland-Markovits partnership was no longer in existence and did not have a bank account. The Johnson check had been deposited in the bank account of the partnership, had been honored by the bank, and the partnership bank account had been credited with a deposit of $37. When the forged check was returned to the bank by the Treasury, the bank collected $37.00 plus a service charge of 15 cents from Friedland by debiting his personal account *186 in the same bank. Friedland was not reimbursed by Markovits or in any way. Petitioner and Markovits had agreed, when the partnership was dissolved, to individually absorb any bad check reimbursements which had to be made to the bank. Friedland sustained a loss of $37.15 in 1946. The loss was incurred in the liquidation of the Friedland-Markovits partnership and was a business loss which would reduce the amount of the gain reported in 1945 upon the liquidation of the partnership. C. Deposit on 107 Club. During 1946 Friedland and 2 other persons joined in a venture for the purchase and operation of a tavern known as the "107 Club" located in east Oakland. The purchase price was $25,000, including stock, fixtures, and license. Each party agreed to contribute 1/3 of the purchase price. Friedland advanced $1,000, deposit on the option to purchase the tavern. The transaction was abandoned because capital could not be raised to finance the purchase. Friedland recovered $500 of the $1,000 deposit which he made on the option, and he was reimbursed to the extent of $166.67 by the other 2 co-adventurers, that is, in the total amount of $233.34. Friedland sustained a loss of $166.66 in 1946 *187 upon the abandonment of this venture. The loss was attributable to failure to exercise an option to purchase property and was a short-term capital loss. D. Broadway Lease. Early in 1946 Friedland and two other persons undertook a venture to obtain an automobile sales agency under the name of Merit Motor Company, each having a one-third interest. A store in the business section of Oakland was leased, and rent was paid under the lease. By March, 1946, it was found that the agency could not be obtained, and the lease was surrendered. The venture was abandoned. The total sum of $2,141.80 was expended by the co-adventurers, of which Friedland's share was $710.60. Upon the abandonment of the venture, a loss of $2,141.80 was sustained, of which Friedland's share of the loss was $710.60. E. Hayward Acreage. During 1946, Friedland and two other persons joined in a venture for the purchase of a tract of land in Hayward, California, for the purpose of subdividing it into large-size lots. Each party had a 1/3 interest in the venture. A 60-day option was given to purchase the property for the price of $60,000. Friedland advanced $1,000 as a deposit on the option. The parties were unable *188 to raise the required capital to purchase the property and permitted the option to expire in August or September, 1946, whereupon the option deposit was forfeited. The other two co-adventurers reimbursed Friedland for their share of the option deposit. Friedland's share of the deposit was $333.33. Friedland sustained a short-term capital loss in the amount of $333.33 in 1946 upon the abandonment of the venture and the forfeiture of the option deposit. F. Fruit Liquor Venture. Under an agreement dated April 9, 1946, Friedland and others entered into a joint venture to manufacture alcoholic spirits from fruit pulp at the plant of Mills Winery, near Folsom, California. Friedland had a 25 per cent interest in the net profits. He was obligated to advance funds for use in the venture and made such advances. He made trips in his automobile to the Fresno area to purchase ripe fruit, and he arranged with Morrison Brothers to haul fruit to the Mills Winery. The co-adventurers purchased a machine which reduced fruit to pulp. Production was undertaken, and a run of pulp was produced in October, 1946. Before the manufacturing process was completed, an employee of Mills Winery tampered with *189 the vat and caused the loss of the pulp through drainage out of the vat. Mills Winery took over the pulp machine and made partial restitution to the co-adventurers. The venture was abandoned in 1946. Friedland, in 1946, advanced $6,379.50 to the venture; he received as reimbursement for loss from Mills Winery $4,614, and he sustained a loss of $1,765.50. Efforts were made unsuccessfully to recover the loss. G. Horse Racing Consensus. In November, 1945, Friedland, Popper, and Hosman agreed to establish a business of selling a release pertaining to race horses to newspaper syndicates, selecting winning horses in races. Hosman agreed to do the work of gathering data about the histories and racing records of race horses for making the consensus and preparing the releases. An office was rented in San Francisco where Hosman kept files, books, and records. Stenographers were employed. Hosman received a salary and a drawing account. Friedland solicited subscribers. Friedland and Popper advanced funds for the venture, for salary, office equipment, and rent. Hosman did research. After six months, it was evident that the venture could not succeed, and it was abandoned on May 24, 1946. Friedland *190 sustained a loss of $1,750 in 1946 in this venture, which amount he contributed without recovery or the possibility of recovery. Friedland participated in the venture for the purpose of making profit and with a bona fide business purpose. H. The Pleasanton Race Track. Friedland engaged in the promotion of a race track at Pleasanton during the months of February to October, 1946. He made bona fide efforts to obtain a franchise to operate a race track from the California Horse Racing Commission. A corporation, The Oakland Jockey Club, was formed. The project involved building a race track. The Racing Commission held a hearing on Friedland's application. Friedland deposited $1,000 for a 60-day option to purchase 75 acres of land at Pleasanton for the site of the track. In October, 1946, the Civilian Production Authority denied priorities for materials to build the track. Also, Friedland had difficulty raising the required capital. Upon advice of Robert C. Burnstein, his attorney, Friedland abandoned the project in October, 1946, and by so doing his deposit of $1,000 for the option to buy realty was forfeited. Friedland paid, also, incorporation fees of $246 and legal fees to *191 Burnstein of $350, total $596. Upon the abandonment of the Pleasanton Race Track venture, Friedland sustained ordinary loss of $596. He sustained a short-term capital loss of $1,000 upon the forfeiture of the option. Attorneys' Fees. During 1946, petitioner paid attorneys' fees in the amount of $2,000 to the firm of Hildebrand, Bills, and McLeod for their legal services to petitioner in connection with his liquor business ventures which he operated in 1945. The expenditure of $2,000 for legal fees was an ordinary and necessary business expense which was incurred in 1945 and paid in 1946. The petitioner reported his income on a cash basis. During 1946 the petitioner paid $375 to an attorney named Hardin for legal services which Hardin's firm rendered to Friedland in connection with his business operations. The respondent agrees that legal expense in the amount of $375 was an ordinary business expense related to the operation of the Denver Club, and that the expense is deductible in 1946. Opinion The petitioner, Edward Friedland, referred to under this issue, hereinafter as the petitioner, claims that he is entitled to business expense deductions for the following: (1) The *192 cost of airplane travel, hotel and subsistence expenses, telephone charges on business trips shown on hotel bills; (2) Business entertainment expense incurred and paid in the course of soliciting others to join in business ventures by investing capital, and in the pursuit of clients in efforts to establish himself as a sales agent or middleman between producers of lumber, steel products, and building materials and purchasers thereof; (3) For expenses incurred and paid in the course of investigating prospective business projects; (4) Agreed reimbursement to two brokers for their traveling expenses on trips to locate stumpage, plywood, and other lumber; (5) Automobile expenses for his own trips by automobile in connection with business; (6) The costs of maintaining an office, of office telephones, of a secretary, and of incidental office expenses. The petitioner claims deductions for all of the above, alleged expenses as follows: Travel, hotel expense, etc.
$ 3,211.91
Business entertainment
1,018.65
Automobile expense - 100%
758.71
Office rent, salary, & Misc.
1,660.79
Office telephone
1,241.93
$ 7,891.99
The petitioner claimed deductions for the above types *193 of expenses in his 1946 return, which the respondent has disallowed, total business expenses in the amount of $8,503.90. He has waived part of the claimed deductions to the extent of $611.91. He claimed $3,502.88 for travel and hotel expense; $1,190.65 for entertainment expense; and $2,041.22 for office telephone expense; and he now claims less for such expenses. On the other hand, he now claims 100 per cent of automobile expense, having asserted that the total amount thereof was $917.84, and than one-half, $458.92, represented business expense; and he now claims a larger deduction for office expenses, having claimed $1,310.23 in his return. During the trial of these proceedings the petitioner offered several items under his claims for deductions which either were 1945 expenses or which he could not substantiate as business expenses, and his counsel has referred to these items in his brief as waived. Nevertheless, cancelled checks for some of the items waived were submitted in evidence and cause some doubt about the correctness of mathematical totals of total deductions claimed for the several types of business expense. Therefore, mention is made hereinafter about such items in discussing *194 the reasons for denying parts of claimed deductions. It has been necessary to check carefully a great many details and items of claimed expenses evidenced by cancelled checks, in order to arrive at correct arithmetic totals. It now appears that correct arithmetic totals have been reached (at the expense of a great deal of the Court's time). If the parties are able to discover any arithmetic errors, they may work out stipulations and incorporate them as part of the Rule 50 recomputation which must be made of the tax deficiencies for 1946 of the petitioners Edward and Helen Friedland. The petitioner claims deductions for the expenses set forth above, as expenses in the conduct of business under section 23(a)(1) of the Code. He contends that he was engaged in the business, in 1946, of a sales agent for purchasers of building materials such as lumber and steel products - sheet steel, steel for pipes, nails, wire, and such, if not in the purchase and sale of such materials. In the alternative, he claims that the expenses are deductible as non-business expenses within section 23(a)(2) of the Code. He admits that he did not receive income during 1946 from such business, but points out that *195 income was realized in 1947 from such business; and he contends that the personal efforts and expenditures expended in 1946 were productive of successful results in 1947 and were groundwork for income subsequently received. He contends that his business efforts during 1946 were undertaken with the intention and purpose of realizing profit and that his failure to realize income in 1946 from his efforts in that year does not, as a matter of law, serve to deprive him of deductions for expenses incurred and paid in connection with his efforts to earn income. The respondent challenges the claims for deductions primarily upon the ground that the petitioner has not substantiated and proved the amounts and payment of alleged expenses. He takes issue, chiefly, with the fact question involved. He does not seriously contest the alternative contention that non-business expenses under section 23(a)(2) of the Code are allowable, admitting that the petitioner's various activities in 1946 were not hobbies or "for the purposes of recreation." He contends that the petitioner was not engaged in a business of buying and selling steel, steel products, lumber, or other building materials, or in any other *196 business. The respondent has stipulated that if the Court decides that the petitioner carried on a business in 1946, then 65 per cent of his office telephone expense was business expense and was not personal expense, and the petitioner has stipulated that 35 per cent was personal expense and is not deductible. Whether or not the petitioner was engaged in any business during 1946 is a question of law. Whether or not the petitioner incurred and paid expenses of the several classes involved and in the respective amounts claimed is a question of fact. Upon all of the evidence it is concluded and held that the petitioner carried on a business in 1946 which is best described, in general, as a business of promoting and financing business ventures, as is discussed later, and which included the promotion of a sales agency or sales representative - middleman - of purchasers and sellers of lumber, steel, steel products, and other building materials. He spent time and made bona fide efforts to get on the lists of producers of sheet steel, pipe steel, and steel products so as to be given allotments of materials for sale; and he spent time and made bona fide efforts to get orders from manufacturers *197 of stoves and pipe, and others for sheet steel, pipe steel, and steel products, which he could fill by placing the orders with the producers of such materials. Also, he spent time and made bona fide efforts to locate supplies of lumber, mills and brokers, and to locate stumpage and peeler logs for plywood. In this field he made agreements with two men, at least, Paul Clink and S. R. Thompson, to pay them brokers fees for stumpage, peeler logs, plywood or lumber, and to reimburse them for their traveling expenses in their search for the same. It is shown that the petitioner's motive in his efforts to act as a middleman or selling agent for building materials, steel products, and lumber was the profit motive. The evidence shows that he achieved more success in 1947 than he did in 1946, realizing income in that year from deals which he arranged and which were closed; but we are satisfied from the entire record that even though he failed to receive income in 1946 from his efforts to buy and sell, or to arrange sales and purchases, of steel, lumber, and building materials, he was nevertheless actively carrying on such business. The expenditures in question had a direct relation to petitioner's *198 business activities. The rule to be applied here is set forth in Doggett v. Burnet, 65fed. (2d) 191, since the evidence shows that the motive underlying all of petitioner's activities was the profit motive, even though he did not get profits in 1946. See also: Cecil v. Commissioner, 100 Fed. (2d) 896; Helvering v. Highland, 124 Fed. (2d) 556, 561. It is significant, also, that the petitioner maintained an office during 1946 from which he conducted his business. Foss v. Commissioner, 75 Fed. (2d) 326. The petitioner held himself out to others as engaged in selling his services or goods. Deputy v. Du Pont, 308 U.S. 488, 499; Fackler v. Commissioner, 133 Fed. (2d) 509; Daily Journal Co. v. Commissioner, 135 Fed. (2d) 687. The petitioner, in addition to claims for business expense deductions, claims deductions for a bad debt loss which resulted from an effort to get the distributorship of two lumber mills, and for losses from six or seven business ventures. In connection with some of these, he claims deductions *199 for attorney's fees. These issues are dealt with separately hereinafter, but the evidence shows that the petitioner was actively engaged during 1946 in promoting a distilled fruit liquor production venture, a race horse record and consensus service for sale to newspapers, and a new race track at Pleasanton, near Livermore, California; that he was engaged, with others, in bidding for the franchise to operate a race track at Phoenix, Arizona; that he investigated prospective business ventures, such as a motel; and that he took steps to start other ventures. The evidence shows that he purchased a lumber mill in Alameda County during 1946, and that he contributed to the financing of some of the ventures mentioned above. Therefore, the evidence brings the petitioner's contention that he carried on business within the rule of Henry E. Sage, 15 T.C. 299, where it was said that one can have a business of promoting and financing so many ventures as to constitute a business. The facts here resemble those in the Sage case. Here the working assets of petitioner's business were his personal services and money. He looked for various prospective businesses, undertook some, and if they *200 were unsuccessful, dropped them. It is held that the petitioner was engaged in a business during 1946. It follows that he is entitled to deductions for the ordinary and necessary expenses of carrying or his business which were incurred and paid in the taxable year. The petitioner reports his income on a cash basis. We are concerned, therefore, with the expenses which he paid in 1946. The next series of questions are fact questions and are whether the petitioner paid various expenses and whether they were connected with his business. These questions have required careful and patient scrutiny of a great many cancelled checks, bills, and testimony scattered throughout the record. The petitioner did not keep, or have kept for him, even a simple record of his accounts. Consequently, he has put a great burden upon this Court, as well as counsel, to analyze a lengthy record to determined whether or not he has met his burden of proof with respect to the several classes of expense involved. The petitioner kept cancelled checks and the check stubs, some bills, and some plane ticket covers, but he relies largely upon his own testimony. We may not and do not disregard the unimpeached, uncontradicted *201 sworn testimony of the petitioner, Quock Ting v. United States, 140 U.S. 417; but neither may we disregard the statutory standard which applies to business expense deductions. Since the petitioner failed to keep memoranda of travel and entertainment expense, in particular, and since he could not connect some cancelled checks with a business transaction, he has failed, in part, in meeting his burden of proof, and, therefore, parts of certain classes of deduction are denied, as is shown later. Cf. Morgan v. U.S., 80 Fed. Supp. 537. (A) Office Expenses: The petitioner filed cancelled checks in evidence in support of his claim for deduction of $1,660.79, total amount of office expenses comprising rent, secretary, stationery, mimeographing, bottled water, typewriter rental, repair of an office chair, and a few other miscellaneous items. Among the cancelled checks offered were a check for $495 and a check for $20, both made payable to cash. The petitioner, after repeated questioning by counsel, could not recall what the check for $495 was for and said he could not tie *202 it up with anything. He could not recall what the check for $20 was for. Since there is no proof that these two checks totalling $515 were paid for office expense, deduction of that amount is disallowed. Included in the total amount of office expense claimed is $100 which was paid for an adding machine. Lacking evidence to the contrary, it must be assumed that the useful life of the adding machine would extend beyond the taxable year. This expenditure is a capital expense, and it is not deductible as a current business expense. The total of the items which are disallowed is $615. The petitioner has established that $1,045.79 was expended for office expense during 1946. It is held that he is entitled to deduct the foregoing amount as ordinary and necessary business expense. (B) Telephone Expenses: The petitioner has established that the office telephones, listed in his name, were for his own use. Kershaw had his own separate telephones. Petitioner's telephone expense for local and long distance service was an ordinary and necessary business expense incurred in connection with his business. The petitioner filed in evidence telephone bills and cancelled checks showing payment. The bills *203 showed a great many long distance calls. Since all could not be explained, the petitioner has agreed that 35 per cent of the telephone expense is to be regarded as personal and non-deductible. The respondent has stipulated that 65 per cent of the telephone expense was not personal and is deductible, if this Court holds that petitioner was engaged in a business. The petitioner bases his claim for $1,241.93 telephone expense on expenditures in 1946 which aggregate $1,910.66, for which amount bills and checks are in evidence. However, telephone charges for 1945 amounting to $157.45 are included in the above total. We do not know and do not decide whether the petitioner carried on a business in December, 1945. Even though the check for $157.45 bearing a date in December, 1945, was paid in January, 1946, it cannot be found as a fact that the expense of $157.45 represented a business expense, and this item must be excluded. The telephone expense for 1946 was $1,753.21, and 65 per cent thereof is $1,139.60. It has been found as a fact that this amount represents the 1946 telephone expense incurred in the conduct of business. Petitioner is entitled to deduct $1,139.60 as a business expense. *204 (C) Business Entertainment and Travel Expense: The petitioner alleges that he spent $1,018.65 for business entertainment expense during 1946. In support of his claim for deduction of this amount, he has offered cancelled checks in evidence. All of the checks are made payable to cash. The amounts of the checks range from $50 to $355.65. In a group of cancelled checks presented during the trial was a check dated December 23, 1945, for $150, which was paid in 1945. This item clearly cannot be allowed as a 1946 expense, and the stipulation has abandoned the item. There is another check for $200 in the group of checks upon which the petitioner relies. It was used for traveling expense to Los Angeles on or about May 17, 1946, when the petitioner and a prospective buyer of lumber, a man named Maroosis, went there to investigate information that brokers in Los Angeles had Douglas fir lumber to sell. Maroosis agreed to pay petitioner a 5 per cent commission if a sale transaction of lumber was consummated. It was not consummated. The evidence establishes that this expenditure of $200 is deductible as business travel expense, and it is so held. With respect to the balance of the so-called *205 entertainment expense - $818.65 - there is no proof that it represented business entertainment expense. For failure of proof, deduction is disallowed. The total amount disallowed is $818.65. The petitioner relied solely upon his testimony to establish that he incurred business entertainment expense of $818.65. His testimony is vague. Furthermore, when questioned about each check, he answered that he could not connect the expenditure with any transaction or business venture or business activity. He repeatedly replied that he could not identify the item. Some of the checks were cashed by the petitioner at a tobacco shop in his office building. The petitioner could not prove that all or part of these expenditures were not for personal expense, and he has certainly failed to prove that the expenditures, if business expense, were ordinary and necessary. Even if we were to accept his general contention that the expenditures were for business entertainment, we could not possibly allow deduction of the amount claimed. Neither could we make any reasonable estimate of the alleged expense if we thought we might properly apply the rule of Cohan v. Commissioner, 39 Fed. (2d) 540. *206 We do not think the rule of the Cohan case can be applied here. (D) Traveling and Hotel Expense: The petitioner claims deductions under section 23 (a) (1) for traveling expenses while away from home in pursuit of his business during 1946. Exclusive of automobile expense in the claimed amount of $758.71, (which is considered separately), the petitioner claims deductions in the total amount of $3,211.91 as follows: Hotel expenses
$ 535.31
Payments to S. R. Thompson
230.95
Transportation & Misc.
2,445.65
Total
$ 3,211.91 In support of his claim for traveling expense deductions, the petitioner relies chiefly upon his own testimony. In corroboration thereof, and also as proof of the expense, the petitioner has filed in evidence hotel bills, cancelled checks made payable to hotels, and other cancelled checks. The amounts of the hotel bills and all of the cancelled checks aggregate $3,211.91, excluding an unexplained cash item on one hotel bill in the amount of $134.75. The hotel bills and the checks made payable to hotels show the dates of the charges, and these dates establish that the petitioner visited Los Angeles and Reno, Nevada, at various times during 1946, *207 through October. In addition, the petitioner filed in evidence several airplane ticket covers. These show the dates of trips to Los Angeles, Reno, and one trip to New York City. The airplane ticket covers show also the costs of the transportation, which total $623.01. The petitioner does not claim a traveling expense deduction of $623.01 in addition to $2,445.65. The airplane ticket covers were offered in evidence to substantiate the contention that the petitioner spent $2,445.65, plus the hotel expense of $535.31. All of the cancelled checks totalling $2,445.65 were made payable to cash except one check for $52.26 made payable to United Air Lines. The payments to S. R. Thompson are made payable to him. These are two questions presented under this issue: (1) Whether the petitioner incurred and paid the amounts set forth above for traveling expense; and (2) whether the expenses were for traveling while away from home in pursuit of petitioner's business within the scope of section 23 (a) (1). The petitioner failed to keep memoranda of the alleged traveling on business. In this situation, in order to find the facts and to determine whether or not the petitioner has met his burden *208 of proof, it has been necessary to comb the long record in these proceedings to locate testimony which is scattered throughout. This has been done with painstaking care and the use of a lot of time. Furthermore, the method adopted by the petitioner of presenting his evidence has necessitated auditing every relevant exhibit to establish the correlations, if any, of the dates of checks made payable to cash with the dates of airplane ticket covers. Finally, arithmetic tests have been applied. The evidence establishes the fact that the petitioner spent $535.31 for hotel, telephone, restaurant, and incidental charges of the usual sort, and this has been found as a fact. The evidence establishes that the petitioner paid Thompson $230.95, and that has been found as a fact. But the evidence does not establish that the petitioner spent the full amount of $2,445.65 for traveling expenses, and the record on this matter must be reviewed. The dates of the cancelled checks for $2,445.65, in many instances, do not correspond with the dates of all of the airplane ticket covers. For example, there is no check bearing a date close to July 5, 1946, which is the date of a round-trip airplane ticket *209 from San Francisco to New York, and return, which cost $272.09. There is no cancelled check in the amount of $272.09, or close to that amount, except checks dated January 16, 1946, April 8, 1946, and April 15, 1946. There is no check bearing any date in the month of July. There are other examples of the same lack of correlation. With respect to the airplane ticket covers which bear odd dates, unconnected with cancelled checks, the question arises whether the petitioner paid for such transportation, particularly because the petitioner has testified that it was customary in the business of procuring steel products, lumber, and building materials for a principal (to use that term loosely) to pay the traveling expenses of a person engaged to look for materials on the basis of a commission for his services, if successful, and reimbursement of his traveling expenses. In fact, the petitioner, himself, made such arrangements with Maroosis (referred to above) in connection with the so-called entertainment expense); with S. R. Thompson; and with Paul Clink (who will be mentioned again in connection with automobile expenses). We fail to find any categorical testimony of the petitioner on the *210 point of who paid for all of the airplane tickets. Furthermore, if the petitioner intended to imply in his testimony that he paid for every one of the tickets submitted into evidence, he failed to produce cancelled checks to show that he paid for the tickets, except in one instance. A check book was received into evidence so that the Court could examine check stubs, and the petitioner relies upon notations made on check stubs, to some extent. There is no check stub showing, for example, the making of a check on or close to July 5, 1946, in the amount of $272.09, the cost of the New York ticket, and other transportation tickets. Finally, there is the testimony of the petitioner regarding the checks made payable to cash, totalling $2,445.65. The petitioner could not state what nine of the checks in amounts ranging from $50 and $100 to $280 and $490, bearing dates in January, April, June, and August (but not July) were for. The nine unidentified checks total $1,590.65. Repeatedly the petitioner testified that it was impossible to explain the use of the proceeds of checks, or to connect the expenditure with any particular business travel, or business activity. In this situation, we *211 are at a loss to understand why, after trial, the petitioner on brief still asserts a claim for business traveling expense deduction to the extent of the unexplained and unidentified sum of $1,590.65. Not only does he still claim that he is entitled to receive a deduction in an amount which embraces the sum of $1,590.65, but he goes even further. He claims allocation of combined entertainment and traveling expenses, including automobile expense, totalling $4,989.27 to the following: Race track, Arizona, $1,100; Race track, Pleasanton, California, $1,800; business of buying and selling lumber, steel products, and building materials, $1,289.27; and other ventures, $800. The above allocations of alleged expenses are, admittedly, estimates. The first allocation of an estimated expense of $1,100 to the efforts to obtain a franchise to operate a race track in Phoenix, Arizona, finds no reasonable basis in the evidence. Those efforts were abandoned in February, 1946, when competitors were awarded the franchise. Furthermore, a partnership was formed to carry on the Arizona venture, and the petitioner agreed to contribute capital. There is no evidence that expenses were not to be shared by *212 at least one other partner. See Ex. 4. As has been discussed under (C), Business Entertainment, the petitioner failed totally to explain or identify cash checks for $818.65. Check stub notations, such as they are, do not identify any of the disputed cash checks as being for the alleged entertainment or travel in connection with any particular business or venture. In two or possibly three instances a check stub bears the notation "Travel to L. A." The evidence shows that automobile traveling was done in connection with "Other ventures," and that the petitioner made several trips to Los Angeles and to Reno, either to interest possible investors in the Pleasanton race track venture (discussed hereinafter under Losses), or to establish contacts with prospective purchasers of steel and steel products, or to search for brokers who had lumber to sell. And there is some testimony, which is general and vague, without any definite detail or the names of people involved, other than some of petitioner's associates, and wholly lacking in any mention of the amount of the alleged expense, that the petitioner went to Los Angeles in connection with the efforts relating to the Phoenix, Arizona, track. *213 Under such circumstances we cannot give as much weight to the uncorroborated, vague, and uncertain testimony of the petitioner as he, on brief, seeks. We have given some weight to the petitioner's testimony, recognizing that a taxpayer cannot always give with exactitude the details of traveling expenses. Cf. Cohan v. Commissioner, supra; Maurice A. Mittelman, 7 T.C. 1162, 1166, 1171; and Maurice P. O'Meara, 8 T.C. 622, 630, 631. It appears that the petitioner relies upon notations on check stubs to support his claim for deductions of the entire amount of $2,445.65, evidenced by checks for "cash." But the check book notations are vague and show nothing other than the word "Travel" or "Entertainment." Check stub notations of such general purport to explain checks made payable to "cash" seldom, if ever, are regarded as adequate proof of a business expense deduction. See Leiter v. U.S. (D.C.) 1933 (unreported), Commerce Clearing House Federal Tax Reporter for *214 1933, par. 9553. This Court has so held in unreported Memorandum Opinions. In this proceeding we can give no weight to such check stub notations for the checks which were made payable to cash, totalling $1,590.65, which the petitioner was wholly unable to explain and identify when given the opportunity during trial. On the entire record relating to this issue, it is appropriate to say, "The sweeping generality of these statements in itself suggests hesitancy in accepting the estimate." Maurice P. O'Meara, supra. We have determined and found that the petitioner spent $535.31 for hotel bills and expenses; $230.95 for reimbursement to S. R. Thompson of his traveling expenses while searching for stumpage for peeler logs for plywood; and $634 for transportation to Los Angeles and Reno - the cost of airplane tickets - and an allowance for meals not covered by hotel bills. We have found, also, that such expense was business expense incurred in pursuit of the steel and lumber purchasing business, the Pleasanton race track promotion, and other ventures. Therefore, the petitioner is entitled to a traveling expense deduction in the total amount of $1,400.26. Of the total amount *215 claimed under this issue, deduction of $1,811.65 is disallowed. This conclusion is reached under the rule of the Cohan case, and because the evidence establishes that the petitioner took business trips during 1946 in pursuit of his business. We have used our best judgment in a situation where no memoranda were kept, the petitioner's testimony was indefinite, and some items were without explanation. In the last analysis, the petitioner bases his claim for travel expense deductions upon an estimate which he made during the trial, even though he could not explain or identify several checks made payable to "cash." This issue is closely like that presented in Charles P. Noell, 21 B.T.A. 1107, 1109, 1110, 1111. What was said there (p. 1111), applies here. See also: Irvine F. Belser, 10 T.C. 1031, 1042; aff'd, 174 Fed. (2d) 391, where the taxpayer's mere estimate of expenses was held to be insufficient proof; and Leslie A. Sutor, 17 T.C. 64, 68, where, also, the taxpayer's estimates were not proof. (E) Automobile Expense: In his 1946 return the petitioner listed automobile expense in the total amount of $917.84; claimed that $458.92 *216 (50 per cent) was business expenses; and deducted $458.92, one-half in each return for himself and his wife. The deduction was disallowed because of lack of substantiation. There are two questions: (1) Whether the petitioner used an automobile in his business, and what were the respective amounts of the business use and of personal use, if any. (2) What the automobile business expense was. The petitioner now contends that 100 per cent of automobile expense was business expense; that his own expense amounted to $677.75 and that $80.96 was automobile expense of a business associate, Paul Clink, which he reimbursed under an agreement, total $758.71. The evidence offered consists of petitioner's testimony, cancelled checks, and bills. The checks and bills total $677.75. No memoranda of expenses were kept. During trial, no evidence was offered relating to automobile license expense and depreciation, and no claim is made for such expense. As in the case of Thompson, the petitioner made arrangements with Paul Clink to pay him a commission for locating stumpage for plywood and to reimburse him for the traveling expenses of his trips. The petitioner paid Clink $80.96 for automobile expenses. *217 It is held that the petitioner is entitled to deduct that amount as a business expense. There remains for consideration expenses of $677.75. Among the bills received in evidence is one of E. A. Crowder which includes charges of $124.56 for November and December, 1945, which were paid in 1946. We cannot consider this item of expense because the issue of whether the petitioner was in any business the last two months of 1945 is not before us. The record shows that this part of the Crowder bill was abandoned during trial, (Tr. p. 681) but on brief the amount involved has been left in the total auto expense. It must be excluded, thereby reducing the amount to be considered to $553.19. On several purchase slips in evidence is the notation that purchases of gasoline, oil, and charges for some repairs were made by petitioner's son, Bob, who is about 21 years old. The evidence does not clearly show that these purchases were for the business use of the petitioner (he only ventured a guess that they were), and since there were 3 cars in the family, the impelling inference is that Bob's purchases were personal and family expenses. Also there are a series of sales slips showing purchases by *218 Ray Duarte for a Cadillac car (as noted on one slip). The record does not show who Duarte is. His purchases total $16.35, and Bob Friedland's purchases total $40.62. The total, $56.97, must be excluded from the amount of the deduction claimed. Another doubtful item is a purchase by petitioner's brother, Dave Friedland, of a tire for $20.24, for which expense the petitioner reimbursed his brother. Testimony on this item is vague and does not establish that it was petitioner's business expense. It is excluded. There remains for consideration, therefore, expenditures of $475.98. Expenditures amounting to $475.98 were for oil and gasoline, tires, and repairs. During 1946 the Friedland family had 3 cars, a Buick, a Dodge sedan, and a Chevrolet coupe. The petitioner admitted during his testimony that his wife and son used cars, and he testified that he could not state, and did not know, for which of the 3 automobiles most of the repair charges were. He was asked to explain what automobile expense was represented by 5 individual checks totalling $210.70 and could not give any explanation. Therefore, for failure of proof, expenses amounting to $210.70 are disallowed. The balance to be considered *219 is $265.28. Expenditures totalling $265.28 were for oil and gasoline and repairs to a Dodge. The petitioner testified that the Dodge was used in the horse consensus business and that repair charges of $92.44 were for repairing the Dodge. The evidence shows that charges for oil, gasoline, and small repairs (not ordered by petitioner's son) aggregated $172.84, which is the difference between $265.28 and $92.44. By whittling away at the assortment of exhibits, we get down to expenditures of $172.84 which were chiefly for oil and gasoline. The testimony of the petitioner is vague and unsatisfactory. Neverthless, it is his sworn testimony that he used an automobile in the pursuit of his varied business, the horse consensus information service, the fruit liquor business, and the Pleasanton race track. From this testimony we have found that the petitioner used an automobile in his business. His testimony establishes that $92.44 was spent for repairing the car used in his business. We allow deduction of that amount. No deduction can be allowed for the automobile expense of trips between petitioner's home and office. There is no evidence that the petitioner did not use his automobile *220 going to and from his home. His home was located in Orinda, Alameda County, which is a fair distance from downtown in Oakland. In our best judgment the cost of using an automobile between petitioner's home and office during 12 months would amount to at least $172.84 for gasoline and oil, which is about $14.30 per month. No doubt the actual cost was more. Therefore, we are unable to determine that any of the sum of $172.84 was spent for the business use of an automobile. It has been found from all of the evidence, therefore, that the petitioner is entitled to deduction of only two items of automobile expense, $92.44 and $80.96 (Clink); total, $173.40. The only other expense deduction claimed by the petitioner is for attorneys' fees. They are discussed later. Summary: Under this issue it has been held that the petitioner is entitled to the following business expense deductions: (A) Office expenses
$ 1,045.79
(B) Telephone expenses
1,139.60
(C) Business entertainment
0
Business travel expense
200.00
(D) Hotel and air travel expense
1,400.26
(E) Automobile expense
173.40
$ 3,959.05
Losses The petitioner claims eight loss deductions in the total *221 amount of $11,321.24 from several ventures under section 23(e)(2), relating to losses from transactions entered into for profit, though not connected with trade or business. The loss from the transaction with Mrs. Carter is claimed under section 23(k)(1) as a bad debt loss. The petitioner contends that in each instance the loss was sustained in 1946. The losses claimed are as follows: A. Mrs. Flora Carter's debt
$ 3,500.00
B. Loss from a forged Treasury
check
37.15
C. Deposit on 107 Club
166.66
D. Broadway lease
710.60
E. Hayward acreage
333.33
F. Fruit liquor venture
2,065.50
G. Horse consensus venture
2,912.00
H. Pleasanton Race Track
1,596.00
$ 11,321.24 The loss deductions were claimed on petitioner's return. They were denied for lack of substantiation. (A) Indebtedness of Mrs. Flora Carter: The question is whether Mrs. Carter's debt of $3,500 became worthless in 1946. Atlantic Coast Line Railroad Co., 4 T.C. 140, 156; Regulations 111, pp. 116, 117; section 29.23(k)-1. Upon the evidence it has been found that the debt was a business bad debt and that it became worthless in 1946. The petitioner was in the business of buying and *222 selling lumber and of a sales agent for building materials, including lumber. Mrs. Carter promised to get petitioner the exclusive right to sell lumber from two mills. Later she promised to pay her debt in kind by making deliveries of lumber. Petitioner's loan of $4,000 to Mrs. Carter and his agreement to release Lewis from his debt of $500 upon Mrs. Carter's agreement to assume the Lewis debt were proximately related to petitioner's business. The evidence shows that her debt became worthless in 1946. She paid $1,000 and then failed to make the succeeding payments as she agreed to do under the August agreement. The petitioner then exerted efforts to locate what assets she might have had but found none and learned that she was indebted to others. The respondent opposes allowance of the deduction because efforts to collect upon the judgment extended into the early part of 1947. If the old test of ascertainment of worthlessness properly were to be applied, the respondent's argument would have merit. But the test to be applied is the occurrence of worthlessness. The fact is that Mrs. Carter became "bankrupt" in 1946. It is true that the petitioner sued to recover the debt. But that *223 is immaterial. Where the circumstances are such that the filing of a suit would not result in collection of a debt, a deduction is allowable even though suit is not filed. Regulations 111, pp. 116, 117, supra. That being true, this petitioner should not be denied the deduction in 1946, the facts being what they are, merely because the return on the writs to levy upon assets, if any, of Mrs. Carter, under the 1946 judgment did not occur in 1946. Deduction of $3,500 for a business bad debt loss is allowed. (B) Loss on a Forged Check: During 1945, until September, the petitioner was a partner with Michael Markovits, Friedland-Markovits partnership, in the business of operating a bar and a liquor store, Mac's Place and Midway. In his return for 1945 the petitioner reported long-term capital gain from the dissolution of the Friedland-Markovits partnership in an amount in excess of $500. The check of Sylvia Earlie Johnson for $37.00, United States Treasury check, was cashed during 1945 at one of the places operated by the partnership. At the time the Treasury check was returned in May, 1946, by the United States Treasury, which refused payment because of forgery by an unknown person *224 who had signed Sylvia Johnson's name to the check, the Friedland-Markovits partnership was not in existence and no longer had a bank account. The Johnson check was referred to the petitioner, as one of the former partners, and the bank collected from the petitioner by debiting his personal account $37.15, including a service charge. It is our understanding that the Friedland-Markovits partnership had had its bank account at the same bank where the petitioner had his personal account in 1946, and that the bank had credited the account of the Friedland-Markovits partnership with $37.00 when the Johnson check had been "deposited" in 1945 in the Friedland-Markovits partnership bank account. The bank had to reverse the 1945 credit when the Johnson check was returned, unpaid, by the United States Treasury in 1946. It did so by debiting petitioner's personal account. A change of fifteen cents was made. The Johnson check clearly represents a loss of $37.15. We are of the opinion that the correct conclusion under the facts here is that the loss is a loss sustained by the petitioner in a business, under section 23(e)(1). The loss is directly related to the former operation of the Friedland-Markovits *225 partnership. The petitioner was engaged in the operation of that business. He has not been reimbursed by his former partner or by anyone else for any part of the loss. Petitioner and Markovits have agreed to absorb various bad check losses and they, each, have made good to the bank on other bad checks by the same method of taking care of the Johnson check. The petitioner has so testified. Also, we understand that it is a fact that the petitioner, personally, did not accept the Johnson check from the forger and did not pay $37.00 in 1945 to the person who presented the check. The effect of his paying the $37 to the bank in 1946 to reimburse it for the credit it made to the partnership account in 1945 is to reduce the petitioner's gain from the dissolution of the partnership by $37.15. He reported the gain in his 1945 return; he reports income on the cash basis; he did not reimburse the bank for the item until 1946; and, therefore, the year 1946 is the year in which he sustained the loss of $37.15. It is held that the petitioner is entitled to a business loss deduction of $37.15. (C) Deposit on 107 Club: (E) Deposit on Hayward Acreage: (H) Deposit on Pleasanton Acreage: The findings *226 of fact dispose of the fact question in each issue. It has been found that in 1946 $1,000 was paid for an option to purchase a tavern and bar, the 107 Club; and $1,000 was paid for an option to purchase land in Hayward. In each instance the petitioner and two others joined together to purchase the option. In each instance they failed to exercise the option. There was recovery of $500 of the $1,000 deposit on the 107 Club option. There was no recovery of the $1,000 deposit on the Hayward acreage option. Petitioner sustained a loss of one-third of each option deposit; $166.66 on the 107 Club, and $333.33 on the Hayward property. The losses were sustained in 1946. However, each loss is "attributable" to failure to exercise an option to purchase property within the scope of section 117(g)(2). Therefore, these losses are short-term capital losses rather than ordinary losses, and the deductions must be computed under section 117(d)(2) which limits capital losses. The petitioner realized capital gains in 1946 which appear to be greater than his shortterm capital losses. Under another issue (H), infra, relating to the Pleasanton Race Track promotion, the same question arises. The petitioner *227 paid $1,000 to obtain an option to purchase 75 acres of land in Pleasanton for a race track. The findings of fact dispose of the fact question. It has been found that the petitioner paid $1,000 for an option; that he failed to exercise the option; and that he lost the deposit of $1,000. He sustained a loss of $1,000 in 1946. Since this loss comes squarely within section 117(g)(2), also, the petitioner is entitled only to a short-term capital loss in 1946. The question with respect to these three option deposits is controlled by Nordbloom Associates, Inc., 15 T.C. 220, 224; Southern Coast Corporation, 17 T.C. 824; and Fred A. Bihlmaier, 17 T.C. 620. (D) Broadway Lease: The loss claimed here is $710.60. It has been found that the petitioner was a co-adventurer with two others, having a one-third interest in a venture under which the acquisition of an automobile agency was contemplated. On the fact question, we have only the sworn testimony of the petitioner. It stands uncontradicted and unrefuted. We have no cause to disbelieve the testimony. The loss arises from the abandonment of the venture after the parties had paid rent on a lease *228 and other expenses. The loss was sustained in 1946. The petitioner is entitled to a deduction for $710.60. (F) Fruit Liquor Venture, Loss
Claimed
$ 2,065.50
(G) Horse Consensus Venture,
Loss Claimed
$ 2,912.00
(H) Pleasanton Race Track,
Loss Claimed
$ 1,596.00 These issues may be considered together. Assuming that the petitioner advanced the sums of money he claims to each venture and suffered the net amounts of the losses claimed, are the losses deductible in 1946? The respondent does not contend that the losses, if they were sustained, are not deductible. The losses are deductible under section 23 (e) (2). Cf. Williams Furniture Corporation, 45 B.T.A. 928, 937. The question with respect to each of these items of alleged losses is a fact question, and is whether the petitioner sustained losses in the amounts which are set forth above. The respondent contends that the petitioner has not proved that he advanced funds for the ventures involved so as actually to have sustained losses in the amounts claimed. On the whole, the respondent errs in his contention that the petitioner has failed to meet his burden of proof. The ventures in which *229 the petitioner became interested were fairly unique, but he did become interested in these ventures; they were business ventures, and the petitioner entered into them with the hope of making profit. The fruit liquor venture grew out of the idea that unmarketable, ripe fruit could be made into a distilled fruit liquor. One of the parties in this venture owned a machine which separated fruit pits from fruit. The parties had a reasonable expectation that they would make a good profit. The record provides an explanation for the collapse of the undertaking which was that some person deliberately caused the loss of fruit pulp which had been prepared for fermentation. Kershaw, with whom the petitioner shares his office, and the Mills Winery appear to have taken over the idea after the petitioner, Popper, and Burnstein were closed out. Popper and Burnstein, in their testimony, corroborate the petitioner's testimony. The petitioner has established by credible evidence that he advanced $6,379.50 for the first operations and that he recovered the net amount of $4,614. It has been found, therefore, that the loss which he sustained amounted to $1,765.50. The petitioner claims that his loss was *230 $300 more than has been found, but he has failed to establish that a check dated April 9, 1946, made payable to cash in the amount of $300 was actually devoted to the fruit liquor venture. Consequently, deduction of $300 out of the entire loss claimed is disallowed. The evidence establishes that there was a venture undertaken by the petitioner, James Popper, and J. B. Hosman in which Hosman was to provide some special knowledge and skill in making a consensus of the merits of race horses. He had a collection of material on the records made by race horses. Evidently he sold Popper and the petitioner the idea that a daily consensus of race horses could be sold to certain journals profitably. This venture is at times referred to by the parties as the "Sports Club." The petitioner's testimony about this venture is corroborated by Popper. Popper and the petitioner advanced funds to pay Hosman's salary and that of some people who assisted Hosman for about 6 months. Popper advanced about $2,000, and the petitioner made checks directly payable to Hosman totalling $1,750. Neither Popper nor the petitioner recovered anything for the advances which they made. The undertaking was abandoned in *231 June or July of 1946. The petitioner contends that in addition to his payments to Hosman in the amount of $1,750, he advanced $1,162 in addition in the horse consensus venture, but we are not satisfied with the evidence with respect to the additional amount. The petitioner cotnends that he paid $1,162 to Popper in connection with the venture. Popper was a witness in this proceeding. The petitioner had an opportunity, therefore, to elicit from Popper the facts with respect to the alleged payment to him of $1,162. Popper was not asked any questions about this matter. He testified that he advanced $2,000 and that he got nothing back. Under crossexamination the petitioner testified that he had no recollection of his own about two checks dated May 24, 1946, made payable to Popper in the total amount of $1,162. He testified that this amount was included in his claim for loss on the basis of information obtained by his wife. His wife was not a witness. With respect to this part of the claimed deduction, there is only hearsay information. It is held, therefore, that petitioner has failed to prove that checks for $1,162 were part of his investment in the consensus matter, and deduction in this *232 amount is disallowed. On the evidence it has been found that the petitioner sustained a loss in 1946 in the amount of $1,750 on account of his advances of money for the operation of the unsuccessful consensus venture. The petitioner was the promoter of the plan to establish a race track at Pleasanton, California, near Livermore. He paid the expenses of the forming of a corporation, and small legal fees for that work. Robert C. Burnstein was the attorney who worked for the petitioner. His testimony corroborates the petitioner's testimony. This was a bona fide undertaking. A public hearing was held by the California Horse Racing Commission which was attended by representatives of transportation companies, of Chambers of Commerce, and of citizens in the vicinity. The reason for abandoning the venture was a ruling by the Office of Civilian Production Administration which restricted the availability of building materials for the construction of race tracks and the like. The petitioner was the only person who advanced funds. The funds which he advanced were for incorporation expenses, Burnstein's legal fee, and $1,000 for an option to purchase land for the race track. Burnstein has testified *233 that the petitioner paid him a fee of $350, plus $246 corporation filing fees. Other evidence establishes that the petitioner paid $1,000 for a 60-day option to purchase the property. When it became evident that it would be impossible to obtain the required building materials to construct the race track and that the petitioner could not obtain the capital required to purchase theland, thepetitioner failed to exercise the option for the land. The venture was then abandoned in 1946. The loss attributable to failure to exercise the option has been considered above. There remain for consideration only the deduction for incorporation expense and the attorneys' fee. The expenses, $596, under the facts were promotion expenses. The corporation never issued stock, and we understand it was dissolved. Petitioner claims these expenses as a loss sustained upon the abandonment of a venture undertaken for profit. His claim is sustained. The only question argued here is the question whether petitioner expended $596, as he claims he did. Since the fact question is decided for the petitioner, the issue is disposed of. The petitioner is entitled to a loss deduction of $596 under section 23 (e) (2). *234 Edward A. Miller, 20 B.T.A. 379; Charles T. Parker, 1 T.C. 709; The Empire District Electric Co., 4 T.C. 925. Attorneys' Fees The petitioner claims as business expense deductions under section 23 (a) (1) four payments in 1946 to attorneys for their services in the respective amounts of $375 (Hardin); $50 (Popper-Burnstein); $100 (Popper); and $2,000 (Hildebrand); total $2,525. The respondent concedes on brief that the legal fee paid to Hardin relating to the Denver Club is deductible. The respondent contends that deduction of the other three payments should be denied for lack of proof as to whether each was for legal services rendered to petitioner in the conduct of his business. The question is a fact question. There is no reason to disbelieve the petitioner's testimony that the payment of $2,000 to the law firm of Hildebrand, Bills & McLeod was for their legal services to the petitioner in the operation of his previous liquor businesses in 1945. Deduction of $2,000 legal fees is allowed. The total deduction allowed is $2,375. There is no evidence to show that the other two payments totalling $150 were business expense or were for *235 legal services. The petitioner, in 1946, joined with Popper and Burnstein in various ventures and made checks payable to them for his contributions of money to business ventures. Neither Popper, Burnstein, nor the petitioner was asked to identify these two payments. Perhaps this was because of oversight during the lengthy trial. Nevertheless, there is failure of proof here. Deductions of $150 are disallowed. Issue 5. Negligence Penalties Findings of Fact No part of the deficiencies of Doris Markovits, Docket No. 30563, or of Helen Friedland, Docket No. 30191, for the years 1944 and 1945, was due to the negligence of Doris Markovits or of Helen Friedland. Part of the deficiencies for 1945 of Michael Markovits, Docket No. 30564; of Edward Friedland, Docket No. 30195, and of Clark Pickens, Docket No. 29738, was due to negligence. Part of the deficiency for 1946 of Clark Pickens, Docket No. 29738, was due to negligence. Opinion The respondent has imposed the 5 per cent negligence penalty under section 293 (a) of the Code in Docket Nos. 30191, 30195, 30563, and 30564, for the years 1944 and 1945; and in Docket No. 29738, for the years 1945 and 1946. We are satisfied from *236 the evidence that the petitioners Doris Markovits and Helen Friedland were not negligent, and that no part of the deficiencies in their taxes for 1944 and 1945 was due to negligence. They were not partners in any of the partnerships in which their husbands were partners. They were reported in separate returns on the community property basis one-half of the income of the partnerships in which their husbands had interests. However, understatements of the net income of the partnerships involved were not due to the negligence of either Doris or Helen. See, Harold B. Franklin, 34 B.T.A. 927. We are satisfied from the evidence that no part of the deficiencies in tax for 1944 of Michael Markovits and of Edward Friedland was due to their negligence. (Docket Nos. 30564, and 30195). We are satisfied from the evidence that part of the deficiencies for 1945 of Michael Markovits, Edward Friedland, and Clark Pickens was due to their individual negligence, and that part of the deficiency for 1946 of Clark Pickens was due to his negligence. (Docket No. 30564, 30195, and 29738). The respective amounts of the negligence penalties in each of the above dockets for 1945 and for 1946 shall *237 be recomputed under Rule 50, on the basis of the Rule 50 recomputations of the amounts of the deficiencies in tax of each taxpayer which shall be made in accordance with the Court's holdings under the issues decided. The deficiencies determined by the respondent fall, in part, but in so far as there remain deficiencies in taxes for 1945 and 1946, the 5 per cent negligence penalties are sustained, subject to the recomputations of the amounts thereof. With respect to the year 1945, each petitioner - Markovits, Friedland, and Pickens - understated the amount of the net income of The Denver Club; and with respect to the year 1946, Pickens understated the amount of the net income of The Denver Club upon which he was taxable in 1946. The petitioners admit understatements of income of The Denver Club. There is substantial evidence that each of the abovenamed petitioners failed to use reasonable care in reporting his income from the operations of The Denver Club. Little v. Helvering, 75 Fed. (2d) 436. Each of the petitioners was experienced in the conduct of the liquor business. The evidence does not convince us that the discrepancies between the income of each taxpayer from *238 The Denver Club which each reported in his return, and the actual and correct amount of the income of The Denver Club were not due in part to the negligence of each taxpayer, Markovits, Friedland, and Pickens. In our opinion, also, each of the above taxpayers was indifferent to the requirement that exact, proper, and accurate accounting records of business transactions shall be kept for income tax purposes. Their duty and responsibility cannot be passed on to others, accountants, or book-keepers, in matters such as were critical in the operations of The Denver Club which have been discussed herein, to wit, the unreported transfers of merchandise. The evidence establishes that these taxpayers were negligent in the keeping of the accounting records of the transactions of The Denver Club. Markovits and Friedland have failed to show, under their burden of proof, that they exercised reasonable care in checking the accuracy and correctness of their income tax returns for 1945. With respect to Pickens, we are satisfied that the respondent, under this issue, has met his burden of proving the negligence of Pickens in reporting his income from The Denver Club for 1945 and 1946. See: Irving Fisher, 30 B.T.A. 433, *239 and cases cited; Watson-Moore Co., 30 B.T.A. 1197, 1207; Gibbs & Hudson, Inc., 35 B.T.A. 205, 211; Milton A. Mackay, 11 B.T.A. 569, 571, 574; Dennis Halkias, 12 T.C. 1091. In the proceeding of Clark Pickens, the situation is the reverse of that of Doris Markovits and Helen Friedland, and of the situation of a spouse in Harold B. Franklin, supra.
Decisions will be entered under Rule 50. Footnotes
1. The following proceedings have been consolidated: ↩
Petitioner
Docket Nos.
Michael Markovits
30564 (1944, 1945); 28885 (1946)
Doris Markovits
30563 (1944, 1945); 28886 (1946)
Edward Friedland
30195 (1944, 1945); 29112 (1946)
Helen Friedland
30191 (1944, 1945); 29113 (1946)
Hazel Pickens
29737 (1945, 1946)
Clark Pickens
29738 (1945, 1946)
*. Breakdown of inventories was determined by using a percentage of total purchases for each separate class of merchandise purchased.↩
*. Average mark-up on total sales.↩
*. Actually totals $296,184.48. ** Average mark-up on total sales.↩
2. The debit was to cash and was proper.↩